572 So.2d 598 (1990)
SUNBELT SECURITY SERVICES, INC.
v.
Gerard J. DELAHOUSSAYE and Gary J. Delahoussaye d/b/a Twin Investments.
No. 90-CA-0176.
Court of Appeal of Louisiana, Fourth Circuit.
December 11, 1990.
*600 Cabibi and Cabibi, Charles E. Cabibi, New Orleans, for Anthony J. Montelaro, defendant in reconvention-appellant.
Sessions & Fishman, Alan D. Ezkovich, New Orleans, for Sunbelt Sec. Services, Inc.
Guste, Barnett & Shushan, William J. Guste, III, Joseph B. Landry, New Orleans, for Gary J. Delahoussaye, defendant-appellee.
Andre P. Guichard, New Orleans, for Gerard J. Delahoussaye.
Before KLEES, BYRNES and WILLIAMS, JJ.
WILLIAMS, Judge.
This is an appeal from a judgment on a lease in favor of defendants/lessors, Gerard J. and Gary J. Delahoussaye d/b/a Twin Investments (hereinafter "lessors"), and against plaintiffs/lessees, Sunbelt Sercurity Services, Inc., and third party defendant, Anthony J. Montelaro, in solido. The judgment was in the amount of $43,800.00, representing accelerated rentals due under the lease, plus 15% attorney fees, with costs and interest from the date of judicial demand.
Lessees appeal, contending that the trial court erred 1) in failing to rescind the contract of lease based on error in the cause of the original contract; 2) in failing to declare the lease an absolute nullity because the contract had as its object an illegal object; 3) in failing to hold that the lessors violated warranties of peaceable possession and fitness for intended use, which would have entitled lessees to terminate the lease and vacate the premises; 4) in not holding that the lessors are barred from recovery even if lessees did unjustifiably default on the lease, since the premises became unfit for its intended use by the fault of the lessors; 5) in failing to find that the lease was terminated upon reletting the premises or renovating the property after Sunbelt's abandonment and, alternatively, in failing to credit lessees with the full amounts received by lessors in reletting the premises subsequent to lessees' vacating the premises; and 6) in failing to award lessees damages sustained when they were forced to vacate the premises as well as attoney fees due to lessors' bad faith failure to perform.
Montelaro, President of Sunbelt and third party defendant, also appeals, asserting as error the trial court judgment binding him as surety on the lease, where Montelaro's signature is affixed to the lease on the line labeled "lessee" but not in a separate capacity as surety. Additionally, Montelaro reasserts and adopts those assignments of error raised by lessees in their appeal.
We hold that, under the facts of this case, the lack of a permit to convert the leased premises into an office pursuant to the City Code of New Orleans and the New Orleans Building Code did not vitiate the consent of the lessees. We also hold that the contract of lease did not have an illegal object which would nullify the contract under LSA-C.C. art. 2030. Further, we hold that the lessors' failure to secure a permit to convert the leased premises into an office immediately upon disapproval of lessees' application for an occupational license did not constitute cause sufficient to justify lessees' abandonment of the premises in this case. Next, we hold that the lease was not terminated by the reletting or renovation of the premises upon Sunbelt's abandonment so long as Sunbelt's right of occupancy remained under the lease, although Sunbelt is entitled to a credit for rentals received by lessors in reletting the premises. We remand for a determination of whether Sunbelt's right of occupancy was *601 usurped by post-abandonment renovations to the property and for a determination of the total amount of rentals received from reletting the premises.
As to Montelaro's appeal, we hold that the trial court erred in holding Montelaro solidarily liable as surety on the lease, where Montelaro expressly signed the lease in the capacity of President of Sunbelt and not in his individual capacity.
Accordingly, we affirm in part, reverse in part and remand for further proceedings consistent with this opinion.

Facts
On April 23, 1985, the parties to this litigation entered into a written lease of commercial property located at 4631 S. Carrollton Avenue in New Orleans for a five year term commencing May 1, 1985 and ending April 30, 1990. The lease, which contained an escalating rent schedule, twice designated that the leased premises were for "Office space only."
Lessees occupied the premises at the start of the lease and began operation of their business. On January 27, 1987, lessees filed with the City a renewal application for their occupational license authorized by LSA-R.S. 47:341 et seq. and required under Chapter 70 of the New Orleans City Code.[1] The record shows that the City issued a 1987 occupational license on February 11, 1987 entitling lessees to operate a business at the address shown, but that the address shown was 4006 Canal Street. The City subsequently disapproved lessees' application for an occupational license at the Carrollton Avenue address.
On February 19, 1987, the City sent to lessees and to the Delahoussayes a letter confirming the disapproval and informing them of the reason, i.e., converting a residence into an office without first securing a permit, which constitutes a violation of the New Orleans Building Code.[2] Before a permit could issue, it was required that three sets of plans and specifications be submitted. The lessees were given until March 2, 1987 to comply with the Code requirements, under penalty of fine and/or imprisonment, and were given the recommendation to "(c)ease operation of unauthorized business." Douglas Emmer, Vice President of Sunbelt, testified that he immediately contacted the lessors to notify them of the problem and also requested of the City an extension for compliance. On March 4, 1987 the City granted lessees' request for an extension until March 31, 1987.
On March 11, 1987, before the expiration of the extension granted by the City, lessees sent written notice to lessors that they were terminating the lease effective April 11, 1987. Lessees vacated the premises at the end of March and returned the keys to lessors on May 2, 1987.
Gerard Delahoussaye of Twin Investments testified that he began attempts to rectify the problem immediately upon receipt of the City's February 19 letters. Specifically, Delahoussaye met with Charles Cochran, Chief Building Inspector, in an effort to obtain an extension of time. On March 18, 1987, he met with Paul May, the Zoning Administrator for the Department of Safety & Permits, and Michael Centineo, Chief Building Inspector for the same department, in an attempt to cure the problem. Delahoussaye testified that he obtained an additional extension until June 2, 1987 to comply with the regulations. It is not clear when or if the required permit was obtained.
After Sunbelt returned the keys, lessors leased the property to various third persons. However, Delahoussaye testified that lessees were at no time prohibited from re-entering the premises. The premises were leased to the campaign of Judge Steven R. Plotkin from August to October 1987 and to the campaign of Judge Patrick M. Schott from August to September 1988. Further, Sunbelt asserts that two additional leases entered into were discovered after *602 the trial, particularly a third lease to Success Seminars, Inc. from February through May 1989 and a fourth lease to a beauty parlor beginning in 1989 and apparently continuing to date.
Sunbelt filed suit on April 2, 1987, alleging fraud and error and praying for rescission of the lease and damages in the amount of $11,280.00. Defendants reconvened, alleging that the lessees were in default and praying for acceleration of rentals due or, alternatively, for specific performance, and filed a third party claim against Montelaro as surety on the lease. The case was tried before a Commissioner, who ruled in favor of defendants in the amount of $2,900.00 and held on the third party claim that there was no suretyship under the lease. Although the trial court initially signed a judgment affirming the Commissioner's recommendation, the court later set aside that judgment as premature, granted a new trial, and ultimately held in favor of defendants in the full amount of $43,800.00 plus attorney fees, costs and interest. The court further held that Montelaro was bound as surety under the lease.

Assignment of Error No. 1
First, Sunbelt contends that because the lessors did not have the required permit there was error as to the principal cause of the contract, specifically, use of the building as an office, which vitiates Sunbelt's consent and entitles them to rescind the contract. This assignment is without merit.
The Louisiana Civil Code articles on vices of consent to a contract provide that consent may be vitiated by error, fraud or duress, LSA-C.C. art. 1948, and that error vitiates consent only when it concerns a cause without which the obligation would not have been incurred[3] and that cause was known or should have been known to the other party, LSA-C.C. art. 1949. See also Don Smart & AssociatesCentury 21 v. Lanier Business Products, 551 So.2d 665, 670 (La.App. 1st Cir.1989). LSA-C.C. art. 1947 defines cause as "... the reason why a party obligates himself."
Louisiana jurisprudence has held that a lease should be rescinded based on error in the principal cause of the contract where a license to operate a particular business could not be obtained, Marcello v. Bussiere, 284 So.2d 892 (La.1973); Guaranty Savings Assurance Co. v. Uddo, 386 So.2d 670 (La.App. 1st Cir.1980), writ den. 389 So.2d 1126 (La.1980), or where property which was the subject of an option agreement contained a zoning classification inconsistent with the use intended by the prospective purchasers, C.H. Boehmer Sales Agency v. Russo, 99 So.2d 475 (La. App.Orl.1958).
In Marcello v. Bussiere, supra, defendants agreed to sub-lease a bar-lounge which they believed to be an on-going enterprise when, in fact, it had been closed for six months due to revocation of its alcoholic beverage license. After the defendants began renovation of the premises, they were informed that they could not obtain an alcoholic beverage license "... in view of the attitude of the Gretna officials toward (the business's) reputation." Id. at 895. The court concluded that there was an error in the principal cause of the contract since the defendants received no on-going business and could not secure a license to operate.
Similarly, in Guaranty Savings Assurance Co. v. Uddo, supra, the lessee contracted to lease certain property for the establishment of a restaurant and adjoining lounge, a motive clearly communicated to the lessor. Despite this, the lessor failed to inform the lessee that the property was not zoned for a lounge and that it had a prior history of neighborhood opposition to any use which would permit the serving of alcohol from the premises. When the lessee applied for the liquor permit, he was met with "solid opposition from city and civic officials," obstacles which he concluded were "insurmountable." Id. at 672. He *603 also learned that under no circumstances would he likely obtain a rezoning of the property. The court granted rescission of the contract.
In the instant case, the reason lessees obligated themselves under the lease was to obtain use of the premises for office space, a cause clearly indicated in the lease itself. Further, this cause was known by the lessors, who not only advertised the premises as office space but also drafted the lease. Nonetheless, under the particular facts of this case, we conclude that there was not an error in cause which would vitiate consent.
Unlike Marcello v. Bussiere, supra, and Guaranty Savings Assurance Co. v. Uddo, supra, the lessees in this case did not show that there was an incurable defect which would unreasonably delay or prevent the issuance of the use and occupancy license. The record shows that the required permit could easily issue upon submission of three sets of plans and specifications for conversion of the premises. Further, the testimony of Michael Centineo, Chief Building Inspector for the Department of Safety and Permits, indicated that the City would not pursue legal action against a tenant notified of a violation unless that tenant continued to occupy the premises without contacting the City. That was clearly not the case here.
The lessors began efforts to cure the problem immediately upon receipt of the City's February 19, 1987 notice and of the lessees' complaint shortly thereafter. Upon the lessees' request, the City granted an extension of time until March 31, 1987 to comply with the regulations. The lessors then requested an additional extension until June 2, 1987, which the testimony of Gerard Delahoussaye shows was granted. Throughout this period, the lessors met with various City officials concerning the problem.
The fact that the lessors were first apprised of a problem in August 1986 when their own application for an occupational license was disapproved pending submission of plans and specifications does not establish unreasonable delay or inability to secure a license. Delahoussaye testified that, upon disapproval of the 1986 license, he contacted the Department of Safety and Permits by phone and believed the problem was cured, as he did not receive another notice until February, 1987.
After considering all of the facts of this case, we conclude that there was no error in the principal cause of the contract which would vitiate lessees' consent. Moreover, even if there were error, Sunbelt is not entitled to rescission since the record shows that the lessors were willing to perform the contract as intended by Sunbelt, specifically, to comply with the regulations which would enable Sunbelt to obtain their use and occupancy license. LSA-C.C. art. 1951. See also Litvinoff, Vices of Consent, Error, Fraud, Duress and an Epilogue on Lesion, 50 La.L.Rev. 1, 39 (1989). Accordingly, lessees' first assignment of error is without merit.

Assignment of Error No. 2
Next, Sunbelt argues that the contract of lease is an absolute nullity under LSA-C.C. art. 2030 because its object, use as an office, was illegal under local law. This argument is without merit.
LSA-C.C. art. 2030 provides:
A contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral. A contract that is absolutely null may not be confirmed.
Absolute nullity may be invoked by any person or may be declared by the court on its own initiative.
The official revision comment to this article states that it codifies the jurisprudential rule that a contract which contravenes the public order is absolutely null.
Lessees' reliance on this article is strained, at best. Operation of the leased premises as an office is not in derogation of municipal law, but merely requires that a permit to convert that particular premises from residential to commercial use be secured first. That lessees did not have the required permit and were disallowed their 1987 occupational license pending acquisition *604 of that permit does not render the contract violative of public order and absolutely null. This assignment is without merit.

Assignment of Error No. 3
Next, Sunbelt argues that the lessors violated their implied warranties of peaceable possession and fitness for intended use, which entitled lessees to unilaterally terminate the lease. We disagree.
LSA-C.C. art. 2692 enumerates the obligations arising from the nature of the contract of lease:
The lessor is bound from the very nature of the contract, and without any clause to that effect:
1. To deliver the thing leased to the lessee.
2. To maintain the thing in a condition such as to serve for the use for which it is hired.
3. To cause the lessee to be in a peaceable possession of the thing during the continuance of the lease.
In support of their argument that they were entitled to terminate the lease as a result of deprivation of peaceable possession and unfitness of the thing for its intended use, lessees cite Mecca Realty, Inc. v. New Orleans Health Corp., 389 So.2d 403 (La.App. 4th Cir.1980). In that case, the leased premises contained electrical wiring deficiencies which failed to meet City Code requirements. When electrical service was discontinued due to the defect, lessee abandoned the premises. Lessor filed suit, alleging damages resulting from the abandonment. In ruling for the lessee, this Court reasoned that the electrical problem was a pre-existing condition for which the lessor was responsible under LSA-C.C. art. 2695.[4] The lessor's failure to remedy the defect resulted in the loss of electrical service and therefore constituted a violation of LSA-C.C. art. 2692(2), entitling lessees to vacate. Sunbelt argues that, under Mecca Realty, lessors' noncompliance with the building code constituted a violation of the warranty of peaceable possession and rendered the premises unfit for their intended use.
Unlike Mecca Realty, the landlords in the instant case commenced curative action immediately upon receipt of the February 19 notice. Extensions for compliance were granted by the City beyond the date Sunbelt abandoned the premises, and the testimony of Michael Centineo indicated that the City would take no legal action during this period as long as curative efforts were being made. Sunbelt had no problems with the building as did the lessee in Mecca Realty when the electrical deficiencies persisted and electrical service was discontinued. Sunbelt was never locked out, evicted or ordered to abandon the premises. Under these facts, we cannot say that Sunbelt's peaceable possession was disturbed or that the premises were unfit for their intended use so as to warrant lessees' abandonment of the premises.
We note that Louisiana jurisprudence has long recognized an implied warranty of compliance with building code requirements. But while nonconformity entitles the lessee to obviation of that nonconformity, the jurisprudence indicates that the lessee is not entitled to vacate the premises unless the noncompliance with building code requirements threatens the tenant's safety or welfare. See Chagnard v. Schiro, 166 So. 496 (La.App.Orl.1936); Armstrong, The Implied Warranty of Habitability: Louisiana Institution, Common Law Innovation, 46 La.L.Rev. 195, 211-212 (1985); Hersbergen, Consumer Protection, 49 La.L.Rev. 315, 322 n. 43 (1988).
In the instant case, Sunbelt introduced into evidence an April 20, 1987 "letter of requirement" by Bhola Dhume, Chief Plan Examiner for the City, to architect Mark *605 Ripple regarding the Carrollton Avenue property. The letter lists the requirements for the plans and specifications to be submitted for the permit and references some fire-restrictive standards. However, the record does not establish that Sunbelt's safety was threatened by the noncompliance with the code requirement that a permit be obtained prior to conversion of the premises from residential to commercial use. Thus, we conclude that Sunbelt failed to show that it was entitled to vacate the premises because of noncompliance with building code requirements.
Accordingly, for the reasons cited, Sunbelt's third assignment of error is without merit.

Assignments of Error No. 4 and 6
Next, Sunbelt contends that even if the abandonment was not justified under the law, defendants should not recover because it was by their own fault that lessees defaulted on the lease. According to Sunbelt, lessors' failure to secure the permit constitutes fault which not only bars their recovery but also renders them liable for damages and attorney fees. These assignments of error are without merit.
As detailed above, the nonconformity with the building code requirement entitled lessees to correction of the nonconformity. However, in view of the lessors' immediate attempts to cure the problem, the extensions for compliance which were granted by the City, and our holding that the premises were not unfit for their intended use, we conclude that the lessees were not entitled to rescission of the lease, damages or attorney fees, and that the lessors are not barred from recovery.

Assignment of Error No. 5
Next, Sunbelt argues that the lessors improperly engaged in self-help and thereby terminated the lease when they relet the premises following Sunbelt's abandonment. (There is no dispute that the lessors entered into four separate leases after Sunbelt vacated the premises. The third and fourth leases, not part of the record, were for terms extending beyond and commencing after the trial of this matter.) In the alternative, Sunbelt asserts that the lessors terminated the lease by remodeling the premises as a beauty salon under the fourth post-abandonment lease. Alternatively, Sunbelt contends that any judgment against them for future rentals must be credited with amounts received from reletting the premises.
In Richard v. Broussard, 495 So.2d 1291 (La.1986), the Louisiana Supreme Court set forth the remedies available to a lessor when a lessee defaults on a lease. That Court stated:
Generally, when a lessee defaults on a lease agreement, the lessor has two options available: he may sue to cancel the lease and to recover accrued rentals due, or he may sue to enforce the lease and to recover both accrued rentals and future accelerated rentals (if the lease contains an acceleration clause). These remedies are mutually exclusive.... If the lessor elects to cancel the lease, the lease is terminated and the lessor is entitled to return into possession, but he forfeits the right to all future rentals. On the other hand, if the lessor elects to enforce the lease, he may obtain a money judgment against the lessee based on the terms of the lease agreement, but the lease remains in effect and the lessee retains the right of occupancy for the remainder of the term of the lease.... However, when the lessee breaches the lease by abandoning the premises, the lessor has the right to take possession of the premises as agent for the lessee and to relet the premises to a third party without canceling the lease or relieving the lessee of his obligations under the lease contract.
Id. at 1293.
The Court noted that, although a lessor generally must resort to the judicial process to take possession of the premises, there is an established jurisprudential exception which allows a lessor to engage in self-help when the lessee has unjustifiably abandoned the premises. Id. at 1293 n. 1, citing Bunel of New Orleans, Inc. v. Cigali, 348 So.2d 993 (La.App. 4th Cir.1977). In such a case, the lessor may rent the property to other tenants without thereby canceling *606 the lease or impairing his recourse against the lessee and is bound to credit the lessee for any amounts received from reletting the premises. Sliman v. Fish, 177 La. 38, 147 So. 493, 495 (1933). See also Shank-Jewella v. Diamond Gallery, 535 So.2d 1207, 1212 (La.App. 2d Cir.1988); Preen v. LeRuth, 430 So.2d 825, 827 (La. App. 5th Cir.1983).
The contract of lease in the instant case incorporated these remedies:
Should the premises be vacated or abandoned by Lessee because of ejectment for breach hereof, or otherwise, or should the Lessee begin to remove personal property or goods to the prejudice of the Lessor's lien, then the rent for the unexpired term, with Attorney's fees, shall at once become due and exigible, and Lessor, at his option, has the right to cancel the lease, or re-enter and let said premises for such price and on such terms as may be immediately obtainable and apply the net amount realized to the payment of the rent.
Under the principles enunciated above and the terms of the contract, the lessors in the instant case had the right to re-enter the premises and relet the property "for such price and on such terms as may be immediately obtainable" upon abandonment by the lessees, with the lessees remaining liable for unpaid rentals less the amount received from reletting the premises.
However, while a lessor may take reasonable steps necessary to relet the property, including refurbishing the premises to attract new tenants, the lessor may not alter the premises to the extent that they cannot be used for the purpose for which they were originally leased. In such a case, the lessor's act ceases to be for the account of the lessee, as it effectively terminates the lessee's ability to re-occupy the premises under the lease. Compare Richard v. Broussard, supra [occupation of the premises by lessors themselves effectively usurped the lessees right to occupy the premises]; Weil v. Segura, 178 La. 421, 151 So. 639 (1933) [sale of abandoned premises terminated the lessees right to occupancy].
The record in the instant case contains no evidence of the work, if any, done to the premises after the abandonment by the lessees or of the full amounts received from the third and fourth leases. Therefore, we remand this case to the trial court for taking of evidence of these leases and the amounts received therefrom, and also for a determination of whether the lessees' right to occupy the premises was effectively usurped by renovation of the premises under the third or fourth lease.

Montelaro's Assignment of Error
The final issue before us is the validity of the surety agreement under the lease. Appellant Montelaro asserts that the trial court erred in holding him personally liable under the lease, where he signed the lease only in his capacity as officer of Sunbelt. We agree.
The final paragraphs of the lease just before the Lessor's and Lessee's Affidavits provides, in pertinent part:
Surety And now comes Anthony J. Monterlaro
 [sic] WHO IS MADE A
 PARTY to this contract of lease
 and is bound with Lessee IN SOLIDO
 for the faithful execution of
 all the obligations to be performed
 on the part of the Lessee....
 This lease is made and signed in
 triplicate, in the City of New Orleans,
 State of Louisiana, this 23 day of
 April, 1985.
 ____________
 Lessee
 ___________
 Lessor
Montelaro signed in the space labeled "Lessee". Gerard J. and Gary J. Delahoussaye signed in the space labeled "Lessor".
On the next and final page of the lease appears the Lessee's Affidavit, which reads, in pertinent part:
On this 23rd day of April 1985, before me, the undersigned authority, personally came and appeared Anthony J. Montelaro resident of Jefferson, who declared and acknowledged to me that he executed *607 the foregoing instrument and signed the same for the purpose and objects therein expressed, acting in the capacity of President, and by order of the Board of Directors, of Sunbelt Security Services, Inc.
Thus, Montelaro expressly signed the lease "in the capacity of President" of Sunbelt.
Our Louisiana Civil Code sets forth the stringent and formal requirements of suretyship, that it must be express and in writing. Former LSA-C.C. art. 3039 (1870) read:
Suretyship can not be presumed; it ought to be expressed, and is to be restrained within the limits intended by the contract.
See also LSA-C.C. art. 3038 (revised by Acts 1987, No. 409, § 1), which restates the rule contained in Article 3039 (1870) and reads: "Suretyship must be express and in writing."
Further, although the contract contained a paragraph attempting to create a suretyship agreement binding the corporate president personally, that president is not liable where he signed the contract only in his capacity as President of the corporation and not in his individual capacity. Solar Supply, Inc. v. Artic Air, Inc., 400 So.2d 924 (La.App. 1st Cir.1981). See Boro Industries, Inc. v. James J. Culotta, Inc., 336 So.2d 878, 880 (La.App. 4th Cir.1976), writ den. 339 So.2d 24 (La.1976); Livingston State Bank & Trust Co. v. Steel-Tek, Inc., 335 So.2d 482, 483 (La.App. 1st Cir. 1976).
In the instant case, the express language of the contract shows that Montelaro signed the lease in the capacity of President of Sunbelt and not in an individual or dual capacity. Therefore, we hold that the trial court erred in finding Montelaro bound as surety under the contract of lease. Accordingly, that portion of the judgment is reversed.
For the foregoing reasons, we affirm in part and reverse in part the judgment of the trial court. Further we remand for the taking of evidence on the third and fourth post-abandonment leases and a determination of 1) the amounts received thereunder and 2) whether Sunbelt's right of occupancy was usurped by renovations to the premises.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
NOTES
[1] From the time the lease commenced until early 1987, the lessees operated their business under occupational licenses which listed lessees' previous business address.
[2] The Building Code requirement is independent of the property's zoning classification, which was C-1, commercial.
[3] But see LSA-C.C. art. 1955, which provides:

Error induced by fraud need not concern the cause of the obligation to vitiate consent, but it must concern a circumstance that has substantially influenced that consent. [Emphasis added.]
[4] LSA-C.C. art. 2695 reads:

The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same.