DANIEL L. DYSART, Judge.
| j This is an appeal of a summary judgment granted in favor of plaintiff-appellee, 501 Rue Decatur, L.L.C. (“501 Decatur”), and dismissing the Reconventional Demand of defendant-appellant, VTM Properties, LLC (“VTM”). For the reasons that follow, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
501 Rue Decatur, L.L.C. commenced this litigation by filing a Petition for Declaratory Judgment (“Petition”) on September 19, 2012, seeking to have a lease recognized as valid and enforceable and a determination that it was not in default of the lease. The Petition alleges that 501 Decatur purchased a leasehold (the “Leasehold”) at a February 24, 2011 sheriffs sale, through which it became the lessee of the 2nd through 4th floors and the attic of a building located at 507 Decatur Street in New Orleans, Louisiana (the “Property”). The Leasehold purchased by 501 Decatur was created by a November 19, 1993 lease between 507 Decatur, Inc. (“507 Decatur”) as lessor and L’Cez, Inc. (“L’Cez”) as lessee. This original lease (sometimes referred to as “the Lease”), recorded in the conveyance records for Orleans Parish on December 1,1993, had a 25 year term beginning on December 1, 1993 (and ending in November, 2018).
| ¡According to the Petition, on February 20, 1997, L’Cez transferred its interest in the Leasehold to Decatur Hotel Corporation (“DHC”). This assignment was also recorded in the conveyance records for Orleans Parish.
The Petition then alleges that “[t]he original Lessor” (presumably, 507 Decatur) merged with Aspara Properties, LLC[1] (“Apasra”) on January 13, 2004 and *863 on September 10, 2010, Apasra sold the property subject to the Lease to appellant, VTM Properties, LLC. (“VTM”). Ultimately, the Leasehold became the subject of a February 24, 2011 judicial foreclosure sale, at which time 501 Decatur acquired the Leasehold.[2]
The Petition alleges that 501 Decatur fully complied with the terms of the Lease and continually paid the monthly rent from the date it became the lessee of the property. 501 Decatur also paid the Leasehold’s taxes and the insurance on the property. VTM accepted and cashed all of 501 Decatur’s checks in 2011. While 501 Decatur also paid rent for nine months in 2012, VTM neither cashed the checks (for reasons unbeknownst to 501 Decatur) nor returned them to 501 Decatur. Rather, on September 14, 2012, VTM sent 501 Decatur a notice to vacate. 501 Decatur maintains that it never defaulted on the Lease responded to the notice to vacate by filing the instant lawsuit.
VTM answered the Petition and filed a Reconventional Demand against 501 Decatur in which VTM alleges that 501 Decatur was “illegally occupying” the premises covered by the Lease. According to VTM, when it purchased the |sproperty on September 10, 2010, the premises were occupied by Decatur Hotels, LLC. (“or one of its predecessors”),[3] which was already in breach of the Lease by failing to pay taxes in 2010. VTM further alleges that Decatur Hotels received written notice of this breach on August 25, 2010 from “the previous owner” (presumably, Apasra).
According to VTM, Decatur Hotels was notified of VTM’s acquisition of the Lease around September 24, 2010, but Decatur Hotels still did not pay the 2010 taxes. Thereafter, some time at the end of 2010 or beginning of 2011, Decatur Hotels “either filed bankruptcy, entered into receivership, or caused the seizure and sale of all its interests.”
On December 27, 2010, VTM again notified Decatur Hotels “through facsimile and U.S. Mail” that it had already breached the lease, and VTM confirmed the cancellation of the lease, demanding that Decatur Hotels vacate the premises. After it did so, 501 Decatur “took possession of the premises sometime in February 2011.” VTM maintained that it never received notice of the “purported transfer/possession between Decatur Hotels and 501 Decatur until April 2011,” at which time 501 Decatur sought to enter a new extended lease and proposed improvements to the property. VTM further alleged that it paid the 2011 taxes, because the taxes “were not paid pursuant to the terms and conditions of the canceled written lease by either Decatur Hotels or 501 Decatur.”
On April 4, 2012, VTM notified 501 Decatur, in writing, that the original Lease “had long been canceled due to non-payment of property taxes, rent and |4other violations.” The notice further advised 501 Decatur that VTM considered 501 Decatur to be renting the premises on a monthly oral lease and was “demand[ing] payment of monthly rental of $6,000 per month, among other terms.” VTM alleged that 501 Decatur had not paid the monthly *864 rents since April, 2012. It then sent 501 Decatur notice to vacate on September 14, 2012, specifying the following reasons: (a) 501 Decatur’s predecessor and 501 Decatur had breached any prior written lease by the continual failure to pay taxes and insurance required by the lease; (2) the prior written lease had terminated due to “lessor breach;” (3) 501 Decatur was occupying the property without any written rental agreement; and (4) 501 Decatur had failed to pay the $6000 monthly rental.
VTM’s Reconventional Demand sought a declaratory judgment finding that (1) that the previous lease between the “previous owner and lessee” (Aspara and Decatur Hotels) was cancelled due to Decatur Hotels’s breach of the lease, (2) no written lease exists between VTM and 501 Decatur, (3) 501 Decatur is in breach of any month to month lease that may exist and as such, it should be ordered to vacate the premises.
On April 1, 2012, 501 Decatur filed a Motion for Summary Judgment on the basis that the lease in existence when VTM acquired the property was still in force and had not been breached or properly can-celled. In the alternative, 501 Decatur sought a summary judgment finding that VTM’s acceptance of rental payments constituted a reinstatement of the lease.
After a hearing on August 30, 2013, the trial court granted 501 Decatur’s motion for summary judgment, finding that the November 19, 1993 lease was in | ¡¡full force and effect, and that 501 Decatur was entitled to peaceable possession of the property. The judgment also dismissed VTM’s Reconventional Demand with prejudice.
VTM timely filed this appeal.[4]
DISCUSSION
“Appellate courts review summary judgments de novo, using the same criteria that govern the trial court’s consideration of whether summary judgment is appropriate.” Richard v. Hall, 03-1488, p. 4 (La.4/23/04), 874 So.2d 131, 137, citing Goins v. Wal-Mart Stores, Inc., 01-1136, p. 5 (La.11/28/01), 800 So.2d 783, 788. See also Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730, 750. Summary judgment “shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” La. C.C.P. art. 966(B). If the opposing party is unable to produce evidence to show that he will be able to meet his burden of proof at trial, then there is no genuine issue of material fact. National Auto. Ins. Co. v. Champ’s New Orleans Collision Center, LLC, 06-1144, p. 2 (La.App. 4 Cir. 2/28/07), 954 So.2d 197, 199 citing Davenport v. Albertson’s, 00-00685, p. 2 (La.App. 3 Cir. 12/6/00), 774 So.2d 340, 342. The non-moving party may not “rest on the mere allegations or denials in his pleadings, but must set forth specific facts showing that there is a genuine issue for trial.” See La. C.C.P. art. 967(B); Foundation Materials, Inc. v. Carrollton Mid-City Investors, L.L.C., 610-0542, p. 5 (La.App. 4 Cir. 5/25/11), 66 So.3d 1230, 1233. Arguments of counsel, “no matter how artful, are not sufficient to raise a genuine issue of material fact” precluding summary judgment. Haney v. Davis, 04-1716, pp. 9-10 (La.App. 4 Cir. 1/19/06), 925 So.2d 591, 597.
*865 Having conducted a de novo review of the record before us, we find that the trial court properly granted summary judgment and we agree with the trial court that (1) the lease at issue had not been canceled, (2) 501 Decatur was not in default of that lease, and (3) 501 Decatur is entitled to peaceable possession of the property.
The Lease that is at the heart of this litigation was signed on November 19, 1993 and was originally entered into between 507 Decatur and L’Cez.[5] The Lease contains certain obligations of the lessee, including the obligation to “pay punctually all City, State and Federal Taxes ... which may be levied or assessed against the property and to deliver to Lessor [507 Decatur] all tax receipts for same.” It further provides that “Lessor shall pay no taxes, and Lessee will reimburse Lessor for Lessee’s portion of same.”[6] We read this latter provision to indicate that, in the event the Lessor pays taxes on the property, it is entitled to reimbursement from the Lessee.
In support of its motion for summary judgment, 501 Decatur filed the affidavit of Edwin M. Palmer, III, who is a “[m]ember and [m]anager of Decatur |7Hotels” and who “had oversight and control of the Leasehold and the Lease.”[7] In that affidavit, Mr. Palmer attests that Decatur Hotels paid rent on the Property “for all of 2010 and January and February 2011.” He further attests that VTM never “refused” any of those rental payments. However, Mr. Palmer acknowledges that Apasra sent an August 25, 2010 notice to L’Cez that the Lease was in default for the failure to pay the 2010 property taxes.[8] There does not appear to be any dispute between the parties that DHC did not pay the 2010 property taxes; in an August 15, 2013 letter from 501 Decatur’s counsel to VTM’s counsel, which was admitted into evidence at the hearing on the Motion for Summary Judgment, the failure to pay the 2010 property taxes is acknowledged. As-para’s August 25, 2010 letter reads in full:
The lease is currently in default for failure to pay the 2010 property taxes in accordance to [sic] the lease. The amount currently due to the City of New Orleans is $7,519.20. This includes the tax, interest, penalties and collection fees. We are enclosing for your review a copy of the property tax bill.
We need this property tax bill to be paid immediately. Please email or fax to my attention the payment receipt from the City of New Orleans for our file. If you have any question or comments, please contact me at your earliest convenience.
This letter contains no reference to the lease being canceled; rather, it simply requests the immediate payment of those taxes.
Thereafter, on September 24, 2010, notice was sent to Mr. Palmer that the property had been transferred from Apasra to VTM. The notice specifically states | sthat the “lease was duly assigned and transferred to ... VTM” and that all rental *866 payments were thereafter to be paid to VTM.[9] Again, this notice contains no mention of the Lease having been canceled. To the contrary, the letter suggests the continuation of the Lease by stating: (1) “[a]ll [of] the Lessor’s right and power to modify the Lease, to terminate the term thereof, or accept the surrender thereof, or to waive the performance ... by you of any obligation thereof ... have been assigned to VTM Properties, LLC,” and (2) “[a]ll other terms and conditions of the lease shall remain in full force and effect.” (emphasis added).
On December 27, 2010, counsel for VTM sent a letter to Decatur Hotels and its counsel indicating that VTM had received notice of a December 29, 2010 judicial sale of the Leasehold.[10] In that correspondence, VTM maintained that the notice was untimely, and that it intended, if necessary, to file for injunctive relief to prevent the sale from proceeding. The letter further stated:
... Please be advised that the lease is canceled and therefore should not be a part of the property sold at sheriffs sale.
Decatur Hotels failed to pay the real estate taxes on the property for 2010 as specifically required under the terms of the lease. On August 25, 2010, the previous owner of the property, Apasra Properties, LLC, sent notice of the failure to pay taxes to Decatur Hotels, LLC. Under the terms of the lease, Decatur Hotels is not required to be placed in default and has assented to and expressly waived legal notices to vacate the premises. Therefore, VTM Properties, LLC hereby confirms the cancellation of the lease and demands that Decatur Hotels, LLC | nimmediately vacate the premises absent a new lease agreement.[11]
While VTM’s December 27, 2010 letter refers to a December 29, 2010 judicial sale of the Leasehold, the record reflects that the sale actually took place on February 24, 2011.[12] The deed transferring the property states that, “by [v]irtue of a writ of’ seizure and sale, the Orleans Parish Sheriff seized several properties located on Decatur Street, one property located on St. Louis Street, and the interest listed as the “LEASEHOLD INTEREST IN 2ND, 3RD AND 4TH FLOORS OF 507 DECATUR ST[.].” At the judicial sale, 501 Decatur was the highest bidder and “property was adjudicated to [501 Decatur] for the price and sum of $7,000,000.00.”
Inconsistent with VTM’s view that the lease had been canceled, as expressed in its December 27, 2010 letter, VTM continued to accept payments from 501 Decatur in the amount specified in the lease — $500 per month, as reflected in the affidavit of Michael Valentino, the manager of 501 Decatur who was responsible for “oversight of all lease and financial transactions of *867 501 Decatur.” In his affidavit, Mr. Valentino attests that Valentino Investments,[13] on behalf of 501 Decatur, wrote rent checks to VTM from March — December, 2011. All of these checks, which are attached to the affidavit, were negotiated by VTM. Mr. Valentino’s affidavit also attests to the payment by 501 Decatur of rent owed | inpursuant to the lease for all of 2012 and one month of 2013,[14] although VTM did not negotiate those checks or return them to 501 Decatur.
On May 18, 2011, Mr. Valentino sent an email to counsel for VTM, in which he introduced himself and requested “to know about any issues relative to the current lease” and in which he also notified “of possible repair and renovation work that might be forthcoming, and request[ed] terms for 25 year extension of the lease past November 2018.” Counsel for VTM responded on June 22, 2011 that VTM “is amenable to entering a new lease ... the terms and conditions of which should be worked out.” She then noted that “the previous tenant had breached the lease by not paying the property taxes and not paying for insurance pursuant to the terms of the lease.” [15] Because of this, “[t]he previous owner and [VTM] were both forced to pay the property taxes for the years 2010 and 2011 to avoid tax sale.” She then noted that VTM “has long considered that lease to be non-existent and [501 Decatur] is now leasing the property on a month to month basis.”[16]
Mr. Valentino responded by advising that 501 Decatur believed the current lease to be “valid and in full force and effect — albeit there are likely some deficient items which [501 Decatur] fully intend[s] to remedy.” He further indicated 501 Decatur’s belief that it “paid all property tax arrears at the sheriffs auction purchase,” but acknowledged that it might be mistaken; he requested that VTM’s counsel advise as to “any outstanding property tax disbursements that have not |nbeen reimbursed” and “any outstanding insurance disbursements that have not been reimbursed.”
On April 4, 2012, counsel for VTM sent Mr. Valentino two letters, one of which reiterated VTM’s position that it considered the lease to be “terminated due to the tenant’s various breaches of the lease,” including “its failure to pay rental, property taxes and insurance.”[17] Both letters advised that, effective immediately, the monthly rental would be $6,000.
Thereafter, on September 14, 2012, counsel for VTM sent a Notice to Vacate to several parties, including Mr. Valentino, which states:
*868 You have five (5) days from receipt of this notice to vacate the following property:

2nd, 3rd, & 4th Floors & attic of 507 Decatur Street ...

Due to, but not limited to, the following:
i. Your predecessor and you have breached any prior written lease which may have existed by your continued failure to pay taxes and insurance as required under the terms of that prior lease;
ii. The prior written lease had terminated due to lessor [sic] breach;
iii. You are occupying the subject property without any written rental agreement of tenancy in place;
iv. You have failed to pay the monthly rental amount demanded in the amount of $6,000.00 as rental payments on your month to month lease.
Thus, the record evidences that VTM accepted rental payments from 501 Decatur for a year after it sent (the December, 2010) notice to 501 Decatur’s predecessor-in-interest, Decatur Hotels, advising that VTM considered the Lease to |12be canceled. The last check written on 501 Decatur’s behalf for rental payments was cashed in December, 2011. Curiously, while VTM apparently maintained that the Lease was canceled at least as of December, 2010, it did nothing for nine months and neither evicted 501 Decatur, nor took any other steps consistent with the position that 501 Decatur no longer had tenancy rights. The record is devoid of any actions on VTM’s behalf (other than the June, 2011 email responding to Mr. Valentino’s email and the April, 2012 demand of an increased monthly rent of $6,000.00) during that nine month period, until it sent the September, 2012 notice to vacate.
With this background, we consider the precise questions before us — whether VTM’s acceptance of rents for a year after it sent notice of default to Decatur Hotels waives that default, or whether VTM is correct in its position that the parties were operating under a month-to-month lease because the Lease had been canceled. We first note that our jurisprudence reflects that:
Generally, when a lessee defaults on a lease agreement, the lessor has two options available: he may sue to cancel the lease and to recover accrued rentals due, or he may sue to enforce the lease and to recover both accrued rentals and future accelerated rentals (if the lease contains an acceleration clause). These remedies are mutually exclusive.
Sunbelt Security Services, Inc. v. Delahoussaye, 572 So.2d 598, 605 (La.App. 4 Cir.1990), citing Richard v. Broussard, 495 So.2d 1291, 1293 (La.1986).
As previously noted, the terms of the Lease call for the lessee (now, 501 Decatur), to pay certain costs, including taxes and insurance, in addition to monthly rent of $500.00. The default paragraph of the Lease states:
Should the Lessee at any time violate any of the conditions of this lease; or fail to pay the rent, water bill, (or other expenses assumed under this lease), punctually |isat maturity, as stipulated; ... and should such violation continue for a period of_days[18] after written *869 notice has been given to Lessee, then the rent for the whole unexpired term of this lease shall, without putting Lessee in default, at once become due and exigi-ble; and in such event, Lessor shall have the option either at once to demand the entire rent for the whole term, or to immediately cancel this lease, without putting Lessee in default, Lessee to remain responsible for all damages or losses suffered by Lessor, Lessee hereby assenting thereto and expressly waiving the legal notice to vacate the premises....
Under the terms of the Lease, the Lessee’s failure to pay “other expenses assumed under [the] lease” is deemed a violation of the Lease. The obligation to “pay punctually all City, State and Federal Taxes ...” is clearly an “other expense[ ] assumed” by the Lessee. Accordingly, the Lessee’s failure to pay taxes punctually is a violation of the Lease. However, in the event of a lease violation, the Lessor, after giving written notice to the Lessee (which, by virtue of the blank space allows the Lessee a “reasonable time” to cure the violation) has two options: (1) to “at once” demand the entire rent for the whole unexpired term or (2) to “immediately cancel the lease.” We recognize that the Lease provisions do state, as VTM correctly noted, that the lessor could exercise one of its two options “without putting Lessee in default.” We also note that the Lease provides that “[fjailure to strictly and promptly enforce these conditions shall not operate as a waiver of 114Lessor’s rights, Lessor expressly reserving the right to always enforce prompt payment of rent, or to cancel this lease, regardless of any indulgences or extensions previously granted.” However, under the clear terms of the Lease, the Lessor’s remedy for a violation is to exercise one of its two options.
In the instant matter, Apasra did neither. While Apasra notified L’Cez (Decatur Hotels, the then current lessee, received the notice) on August 25, 2010 that the lease was in default for the unpaid 2010 property taxes and demanded immediate payment, the record is devoid of any evidence that Apasra did anything further. Nothing suggests that it demanded the rent remaining for the full term of the lease; and nothing suggests that it “immediately” cancelled the lease. Rather, Apasra (and VTM thereafter) continued to operate as though the lease was still in effect.
According to Mr. Palmer’s affidavit, even after receipt of the August 25, 2010 letter, Decatur Hotels continued to pay rent under the Lease through February, 2011 (or for 6 months, until the judicial foreclosure). Nothing in the record indicates that Apasra (or VTM, who purchased the property in September, 2010) rejected any of those rental payments. Likewise, upon its acquisition of the Property in late September, 2010, VTM simply notified Mr. Palmer that the Lease had been assigned to it, that all rental payments were to be made to it, and that the “terms and conditions of the lease” remained in full force and effect. It follows, therefore, that contrary to VTM’s contention, the Lease had not been cancelled at the time of 501 Decatur’s purchase of the Lease. We further find that the letter of December 27, 2010, from VTM’s counsel to counsel for Decatur Hotels, and in which VTM maintained that the Lease had been cancelled, does not *870 operate as a cancellation of the Lease. This purported cancellation was not made | ^“immediately” and is in direct contradiction with VTM’s September, 2010 letter which clearly indicates that the lease was still operative.[19]
Where a lessor notifies a lessee that a lease is canceled due to a violation of the lease and then continues to accept rent payments, the lessor has waived the violation and the lease agreement is reinstated. In A & J, Inc. v. Ackel Real Estate, L.L.C., 02-259 (La.App. 5 Cir. 10/16/02), 831 So.2d 311, for example, after a tenant had violated a lease by failing to remove signs and reserved designated parking spots not permitted by the lease, the lessor notified the lessee of the violations and demanded their cure within 15 days. This resulted in a Petition for Declaratory Relief by the lessee, and a recon-ventional demand by the lessor, seeking to evict the lessee.
Although recognizing that the lease had been violated, the court held that the lessor’s acceptance of 3 months of rent after notice of default and eviction had cured the prior lease violation. The court cited the Louisiana Supreme Court case of Canal Realty and Improvement Co. v. Pallet, 217 La. 376, 46 So.2d 303 (1950), which held that the acceptance of rent after notice of eviction by the landlord, “constituted a waiver of that notice and a forgiveness as to any and all previously committed infractions, and it served to reinstate the lease as of that time.” A & J, Inc., 02-259, p. 7, 831 So.2d at 316.
The A & J court also relied on a prior decision of this Court which indicated:
The major issue in this case is the question of whether the cancellation of the lease was waived upon acceptance of rent after the notice of cancellation was | ingiven.... The jurisprudence has been consistent in holding that when rental payment has been accepted after a notice to vacate has been given, the notice is vitiated and the tenant’s possession is maintained. Flores v. Gondolier, Ltd., 375 So.2d 400 (La.App. 3rd Cir.1979); Murphy Oil Corporation v. Gonzales, 316 So.2d 175 (La.App. 4th Cir.1975); West End Landing, Inc. v. Board of Commissioners, 299 So.2d 418 (La.App. 4th Cir.1974); Arms v. Rodriguez, 232 La. 951, 95 So.2d 616 (1957).
Id., quoting Ernst Food Mart, Inc. v. Jackson-Atlantic, Inc., 405 So.2d 1272, 1273-1274 (La.App. 4th Cir.1981). See also Adam, Inc. v. Dividend, Inc., 447 So.2d 80, 82 (La.App. 4 Cir.l984)(“By accepting a part of the rent demanded, the lessor vitiated the effect of the default and the notice”); Thompson v. Avenue of Americas Corp., 499 So.2d 1093, 1095 (La.App. 3 Cir.1986)(“the sixty day notice of default, as required by the lease contract, was vitiated by the acceptance of a part of the rent as demanded. The lease was reinstated by the acceptance of the April rent”).
VTM’s case hinges on Decatur Hotels’s violation of the Lease due to its failure to pay the 2010 property taxes. However, the record demonstrates that VTM continued to accept rent payments from Decatur Hotels through February, 2011 and from 501 Decatur thereafter through 2011.[20] Likewise, VTM’s accep *871 tance of rent payments from 501 Decatur continued for a year after it sent notice to Decatur Hotels of its position that the lease had been cancelled by Decatur Hotels’s failure to pay the 2010 property taxes.
VTM’s acceptance of rent payments operated to waive Decatur Hotels’s violation of the lease; the notice of cancellation was therefore vitiated and the lease agreement was reinstated.
| ^CONCLUSION
Based on the foregoing, and our de novo review of the record, we find that the trial court correctly granted summary judgment in 501 Decatur’s favor.
AFFIRMED.

. The Petition states the company name as "Aspara.” However, the record reflects its true name to be "Apasra.”

. The foreclosure arose in the matter entitled Whitney National Bank v. Decatur Hotels, L.L.C. and Lafayette Hotel Acquisitions, Inc., case no. 10-9955, filed in the Civil District Court for the Parish of Orleans.

. While the Reconventional Demand does not indicate whether Decatur Hotels is the same entity as DHC, which is referenced in the Petition, the deed transferring the Leasehold interest to 501 Decatur after the foreclosure sale states that DHC is "now known as Decatur Hotels.” Accordingly, they appear to be one in the same and will hereafter be referred to as "Decatur Hotels.”

. We note that VTM’s appellate brief recounts a "brief history of the property,” asserting a myriad of events (mainly dealing with inter-family disputes) which allegedly led to this litigation. These "facts” are not in the record and are not considered in this opinion.

. It is undisputed that on February 20, 1997, L'Cez assigned its interest in the Leasehold to Decatur Hotel Corporation. The assignment was recorded in the conveyance records for Orleans Parish.

. There is a reciprocal clause providing that the “Lessee will pay all taxes, and Lessor will reimburse Lessee for Lessor's portion of same.”

. Mr. Palmer's affidavit, dated March 29, 2013, was attached to 501 Decatur’s Motion for Summary Judgment.

. L’Cez was no longer the lessee at that time, having transferred its interest in 1997 to DHC. However, that this notice was sent to L’Cez through Mr. Scott Day, rather than to DHC, does not appear to be an issue in this case.

. The notice enclosed a copy of the September 10, 2010 Assignment of Lease by which Apasra assigned its interest in the Lease to VTM.

. The date it received notice is in dispute; VTM maintains that it received notice on December 24, 2010, while 501 Decatur indicates that notice was received on December 10, 2010. The actual date of VTM’s notice is not relevant to this matter as the foreclosure sale is not at issue herein.

. This is this is the first indication to Decatur Hotels that VTM expressly maintained that the Lease was canceled. We note, too, that the record does not demonstrate that VTM attempted to enjoin the foreclosure sale of the Lease based on its contention that the Lease had already been canceled.

. The record does not contain information as to the cause of the delay of the judicial sale.

. Valentino Investments if an "affiliated entity" of 501 Decatur.

. The affidavit is dated January 26, 2013; accordingly, at the time of Mr. Valentino’s affidavit, 501 Decatur was current in its rental payments.

. While this email suggests that, in addition to failing to pay property taxes, Decatur Hotels also failed to pay insurance on the property. The August 25, 2010 letter from Apasra to L’Cez (which was received by Decatur Hotels) only notes that taxes had not been paid. This is the first occasion on which the failure to pay insurance payments is mentioned.

. This is the first mention of VTM's contention that the parties were operating on a month-to-month lease.

. The record contains no earlier document which suggests that the payment of rentals was an issue or formed the basis for the alleged termination of the Lease; all other documents point only to Decatur Hotels's failure to pay property taxes. Likewise, as we previously noted in footnote 10, the August 25, 2010 letter from Apasra to L'Cez only notes that taxes had not been paid; there is no indication that insurance on the property had not been paid.

. The period of time was left blank in the Lease. However, under Louisiana law, when a term is left blank, it is considered to indicate a “reasonable” period. See La. C.C. art. 1778 ("A term for the performance of an obligation is a period of time either certain or uncertain ... It is also uncertain when it is not determinable, in which case the obligation must be performed within a reasonable time.”); see also Goldblum v. Harden, 188 *869 So.2d 630, 632 (La.App. 4th Cir.1966) (where lease left blank the period of time for the lessee to cure a violation of the lease after written notice from the lessor, the court held that "after being notified of a lease violation the tenant should be given a Reasonable delay within which to correct the same before the landlord would have the right to terminate the lease.”)

. We also note that, while the December 27, 2010 letter demanded that Decatur Hotels "immediately vacate the premises absent a new lease agreement,” VTM did not follow up and begin eviction proceedings or otherwise make efforts to force Decatur Hotels to vacate the premises. Rather, VTM continued to collect rent from Decatur Hotels in January and February, 2011, as Mr. Palmer attested.

. Again, we note that VTM cashed all of 501 Decatur’s checks for 2011; it is unclear what *871 became of the checks sent on 501 Decatur’s behalf in 2012 and the beginning of 2013.