726 So.2d 1094 (1999)
J.L. WALTERS and R.L. Walters & Sons, Inc., Plaintiffs-Appellees,
v.
C.G. GREER and Wanda Greer, Defendants-Appellants.
No. 31,480-CA.
Court of Appeal of Louisiana, Second Circuit.
January 22, 1999.
*1095 Leo A. Miller, Jr., Monroe, Counsel for Appellants, C.G. Greer, et al.
Dennis G. Stewart, Rayville, Counsel for Appellees, J.L. Walters, et al.
Before STEWART, CARAWAY and HIGHTOWER (Pro Tempore), JJ.
STEWART, J.
The Greers, C.G. Greer and Wanda Greer, along with their sons, Charles Greer and Jimmy Greer, appeal the trial court's denial of their reconventional demands filed in this lease dispute. For the reasons discussed herein, we affirm.

FACTS
On March 1, 1993, J.L. Walters, individually and as representative of R.L. Walters & Sons, Inc., leased two tracts of land, referred to as the Alto property and the Start property, to C.G. Greer and Wanda Greer for farming operations. The lease provided for a three year term, commencing March 1, 1993, and ending January 31, 1996. The lease also provided that the lessee shall have the "first option to renew" the lease at the "then agreed upon terms." Rent was the greater of $34,000 per year or one-fifth of the crop production and was, according to the terms of the lease, "payable in part by conveyance of the entirety of the Advance A.S.C.S. Program payments when received." C.G. Greer and Wanda Greer subleased the Alto property to their sons, Charles Greer and Jimmy Greer, for their own farming operations.
Shortly after beginning farming operations on the Alto property in 1993, the Greers lost the right to farm that property for the 1993 crop year when Walters lost in a lease dispute with Alan Whitman, a prior lessee of the Alto property. Walters paid C.G. Greer and his two sons each $700 and paid a fertilizer bill in the amount of $4,589.50 as compensation for the work done. The Greers paid no rent for the Alto property in 1993.
In 1994, the Greers installed a water well on the Alto property. Since 1927, the Alto property had been irrigated by the Boeuf River. The Greers first attempted to lease an old pump unit, but it exploded within *1096 eight hours of use. Because a new power unit and pump would cost about $11,000, the Greers decided to install a less expensive electric water well which would cost only $4,800 and which would be less expensive to operate and easier to handle. They spoke to J.L. Walters about installing the well. Walters consented and told them that they would have the property as long as they wanted it. The Greers used the well during the 1994 and 1995 crop years.
In 1995, the Greers did not receive the Advance A.S.C.S. Program payments and, consequently, did not pay any portion of the rent at the start of the crop year. In a letter dated June 8, 1995, Walters informed C.G. Greer that the rent was overdue and demanded satisfaction of the rental obligation. In another letter dated August 14, 1995, Walters expressed dissatisfaction with the amount of rent required under the lease and the manner of payment. He asked C.G. Greer to agree to an earlier termination date. Again in a letter dated September 14, 1995, Walters asked C.G. Greer to sign and return a cancellation form terminating the lease on December 31, 1995. Walters also made reference to the Greers having returned some items and having removed some of their own items from the leased property. C.G. Greer responded to none of these letters. Walters again contacted C.G. Greer about the lease in a letter dated September 26, 1995. Sometime after the September letter, Walters and C.G. Greer had a telephone conversation, which was referred to by Walters in a letter to C.G. Greer dated October 4, 1995. According to the letter, Greer informed Walters that he no longer intended to farm the leased property but that his son, Jimmy Greer, wanted to farm the Alto property. Walters responded that his lease was with C.G. Greer and that he did not want to enter a lease with Jimmy Greer. In this last letter, Walters again asked C.G. Greer to sign and return the lease cancellation.
The Greers picked their 1995 cotton crop in September 1995. After picking the Alto and Start properties, they moved their equipment to another field. In mid-October 1995, Walters allowed new lessees to begin disking the cotton stalks on the Alto and Start properties and to place cattle on the Start property. Neither C.G. Greer nor his sons did anything to stop these activities nor voiced any objection to Walters.
Because the Greers paid only $24,000 in rent for the 1995 crop year, Walters filed suit against his lessees, C.G. Greer and Wanda Greer, for the unpaid portion of the rent. The lessees answered and, along with their two sons who intervened, filed reconventional demands. The Greers asserted that they overpaid rental for the 1993 and 1994 crop years. They sought damages for loss of the Alto property in 1993, loss of scrapping profits in 1995, and loss of the lease renewal right. They also sought reimbursement for expenses associated with installing a water well on the Alto property.
After a trial on the merits, the trial court ruled in favor of Walters, finding that the Greers owed $10,000 in past due rentals for the 1995 crop year. However, the trial court allowed a setoff for rental overpayments made by the Greers in 1993 and 1994 and awarded Walters $4,451.65. The trial court denied the remaining claims asserted by the Greers. In thorough written reasons, the trial court found that the parties reached an accord and satisfaction of the claim for loss of the Alto property in 1993, when Walters paid Greer and his two sons $700 each. With regard to the claim for loss of scrapping profits in 1995, the trial court found that there was no proof that sufficient cotton remained on the stalks after the first picking to justify the scrapping procedure and that the Greers gave Walters every indication of having abandoned both properties after the first picking. The trial court further found that the parties never reached a meeting of minds with regard to renewal of the lease, therefore no renewal occurred as contemplated by the terms of the lease. Lastly, the trial court determined that no reimbursement was due for expenses associated with the water well. From this adverse judgment, the Greers seek relief.

DISCUSSION
An appellate court may not set aside a trial court's factual findings in the absence of manifest error. Stobart v. State, Through *1097 DOTD, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). To reverse a trial court's factual determinations, an appellate court must find, based on the record, that no reasonable factual basis exists for the factual findings and that such findings are clearly wrong or manifestly erroneous. Mart v. Hill, 505 So.2d 1120 (La.1987); Thompson v. Coates, 29,333, (La.App. 2nd Cir. 5/7/97), 694 So.2d 599. The issue to be resolved is not whether the fact finder's conclusion was right or wrong, but whether the fact finder's conclusion was reasonable. Stobart v. State, Through DOTD, supra.
An appellate court may not disturb a trial court's reasonable evaluations of credibility and inferences of fact made when there is conflicting testimony. The trier of fact's choice between two permissible views of the evidence cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, supra. The determination of credibility is a function allocated to the discretion of the trial court because the trial court is able to observe and evaluate live witnesses, as opposed to the appellate court's review of a cold record. Benton v. Shelter Mutual Insurance Co., 550 So.2d 832 (La.App. 2nd Cir.1989). With these principles in mind, we now examine whether the district court erred in denying the reconventional demands asserted by the Greers.

Loss of the Alto Property in 1993
The Greers contend that the trial court erred in finding that an accord and satisfaction resulted from Walters payment to them of $700 each and payment of a fertilizer bill. The Greers assert that there was no negotiation or agreement that these payments would result in an accord and satisfaction and that the acts of cashing the checks and remaining silent for three years do not constitute acceptance of an accord and satisfaction by them. Our review of the record reveals no clear error in the trial court's denial of this claim.
Application of the doctrine of accord and satisfaction requires that the debtor tender payment to the creditor in full satisfaction of a disputed claim and that the creditor accept the tender. Acceptance requires informed consent, meaning that the creditor must fully understand that acceptance of the tender constitutes payment of the claim in full. Whether the creditor was fully informed of the nature of the compromise offered by the tender is determined by the circumstances. Additionally, the question of whether the check has been tendered and accepted as full payment is a matter of fact. Where the tender clearly sets forth that the lesser sum is offered in full payment of the disputed debt, acceptance of the tender constitutes acceptance of the debtor's offer. Harmon v. Simon, 624 So.2d 981 (La.App. 3rd Cir.1993); Cowley Corp. v. Shreveport Packing Co., Inc., of Kansas, 440 So.2d 1345 (La.App. 2nd Cir.1983).
A disputed claim arose in 1993 when the Greers were unable to farm the Alto property after Walters lost in a lease dispute with a prior lessee of that property. Walters then paid C.G. Greer and his sons each $700 and paid a fertilizer bill in the amount of $4,589.50. These checks do not clearly set forth that payment is made in full satisfaction of the disputed debt. Therefore, whether these payments were tendered by Walters and accepted by the Greers, with their informed consent, in full payment of the disputed claim is a matter of fact that must be determined from the circumstances of this case. The record supports the trial court's factual finding that an accord and satisfaction resulted in this instance.
Walters testified that he asked C.G. Greer what would be fair compensation after losing the Alto property. According to Walters, C.G. Greer wanted to think about it and talk to his sons. Sometime later C.G. Greer contacted Walters and asked that he pay them each $700. Walters paid the requested amount and paid a fertilizer bill which the Greers incurred in preparing the Alto property but from which they would not benefit. Walters testified that the Greers never expressed any dissatisfaction to him about the amount paid and that they did not pay any rent for the Alto property in 1993.
C.G. Greer and Jimmy Greer both testified that there was no negotiation or agreement that acceptance of the checks would constitute settlement of their claim for loss of the *1098 Alto property. However, they did admit to accepting and cashing the checks. When asked whether he expected more than payment of $700 each and payment of the fertilizer bill, C.G. Greer replied, "I think not". He explained that they did not know whether it was a fair agreement but that they accepted it. C.G. Greer further testified that he did not speak to Walters about receiving additional money for the loss of the right to farm the Alto property. The record further indicates that the Greers spent only two days working on the Alto property in 1993.
Considering the testimony of Walters and C.G. Greer, we find no manifest error in the trial court's finding that Walters tendered the checks in settlement of the disputed claim and that the Greers accepted the tendered checks resulting in an accord and satisfaction of their claim. Although there is some conflict in testimony, the trial court's determination is supported by the record. The record indicates that C.G. Greer asked for payment of $700 each for himself and his sons, accepted tender of such payment from Walters, and did not request payment of any additional compensation. Under these circumstances, the trial court's denial of this claim is not clearly wrong.

Loss of 1995 Scrapping Profits
The Greers contend that the trial court erred in finding that they abandoned the leased property after the first picking of the cotton crop in 1995. Rather, the Greers assert that they were wrongfully evicted from the property when Walters allowed new lessees to go onto the property and destroy the standing crops. The Greers also assert that they intended to scrap the remaining cotton and that nothing in the record supports the finding that they abandoned the leased property.
The lessor is obligated to cause the lessee to remain in peaceable possession of the leased property during the continuance of the lease. La. C.C. art. 2692. The lessor who breaches this obligation by interfering with a lessee's possession is liable for the damages that result. Webb v. Theriot, 97-624 (La.App. 3rd Cir. 10/29/97), 704 So.2d 1211; Moity v. Castille, 469 So.2d 503 (La. App. 3rd Cir.1985). The lessor who seeks to evict a lessee must do so in accordance with the procedure set forth in La. C.C.P. art. 4701, et seq. In this instance, the Greers were not evicted from the leased property in accordance with the appropriate procedure. Rather, Walters appears to have breached the obligation of insuring C.G. Greer's peaceable possession of the property by allowing new lessees to go upon the Alto and Start properties prior to the January 31, 1996, termination date of the lease.
While a lessor must ordinarily utilize the appropriate procedure and judicial process to take possession of leased property prior to termination of the lease, a jurisprudential exception permits self-help by the lessor when the lessee unjustifiably abandons the premises. Sunbelt Sec. Services, Inc. v. Delahoussaye, 572 So.2d 598 (La.App. 4th Cir.1990). Abandonment requires voluntary relinquishment of the premises by the lessee with the intent to terminate without vesting ownership in another. Bill Kassel Farms, Inc. v. Paul, 96-462 (La.App. 3rd Cir. 12/11/96), 690 So.2d 807, writ denied, 97-0712 (La.4/25/97), 692 So.2d 1095; Preen v. LeRuth, 430 So.2d 825 (La.App. 5th Cir.1983). The determination of abandonment is a factual determination and cannot be disturbed absent a finding that the trial court was clearly wrong. Preen v. LeRuth, supra.
The record supports the trial court's factual determination that the Greers abandoned the property after completing the first picking of the 1995 crop. Nothing in the record supports the Greers' contention that they intended to scrap the remaining cotton in 1995. The Greers did not scrap their crops in either 1993 or 1994. The testimony of both Jimmy Greer and Charles Greer was that they picked the crops during the early part of September 1995, beginning the first week of that month. The September 14, 1995 letter from Walters to C.G. Greer indicates that the Greers had, at that time, already removed equipment from the Start and Alto properties. The testimony of C.G. Greer, Charles Greer, and Jimmy Greer also indicates that they removed their equipment, including fuel tanks, cotton modules, and the electric pump used in the well on the Alto *1099 property, sometime after the first picking. Even though C.G. Greer received monthly letters from Walters regarding the lease, C.G. Greer made no apparent effort to respond. C.G. Greer testified that he did not have time to respond and suggested that the existence of the lease did not require him to respond to Walters' concerns. C.G. Greer's lack of response to Walters' concerns regarding his dissatisfaction with rental payments and his desire to terminate the lease at an earlier date evidences a lack of interest on the part of C.G. Greer to continue the lease and weighs in favor of finding an intent to abandon the lease on the part of the lessee, C.G. Greer.
In October 1995, after concluding that the Greers abandoned the lease, Walters allowed new lessees to begin disking the property and to put cattle on the Start property. Mike Finely, the lessee who disked Alto and Start, testified that he would not have intentionally destroyed standing crops. The record also indicates that neither C.G. Greer nor his sons knew that another party had placed cows on the Start property and had begun disking until told so by Alan Whitman, the prior lessee of the Alto property. Neither C.G. Greer nor his sons contacted Walters about the situation.
The circumstances present here are similar to those in Bill Kassel Farms, Inc. v. Paul, supra, in which the lessee was found to have abandoned the lease when he ceased farming operations, removed a substantial amount of his equipment, failed to respond to a letter from the lessor regarding termination of the lease, and made no further attempts to farm the property after receiving that letter. In the instant case, the Greers ceased farming operations on the Start and Alto properties after the first picking in September 1995, removed their equipment, and made no efforts to respond to Walters' letters. All of these factors indicate that the Greers voluntarily relinquished the leased property with the intent to terminate the lease without vesting ownership in another. The trial court's determination that the Greers abandoned the leased property is not clearly wrong. Having abandoned the property, the Greers have no basis to claim damages for loss of scrapping profits in 1995.

Loss of the Lease Renewal Right
The Greers contend that the trial court erred in denying damages for loss of the lease renewal right, which they describe as a right of first refusal. The Greers argue that the trial court's finding that there was no meeting of the minds between the parties as to renewal of the lease overlooks the real issue, which is whether they were denied the right of renewal or first refusal by wrongful dispossession. Our determination that the Greers abandoned the lease pretermits the need to address this issue, since the abandonment establishes that C.G. Greer did not intend to exercise any such right of renewal. In the absence of wrongful dispossession or eviction, the Greers were not denied any right of renewal. Rather, the Greers rejected renewal of the lease by their abandonment of the leased property.
However, our review of the record indicates that the provision in the lease relied upon by the Greers as being a right of renewal or first refusal is nothing more than an agreement to agree on a new lease. The lease provision at issue provides, "Lessee(s) shall have the first Option [sic] to renew this lease on the then agreed upon terms for three (3) years." This provision clearly requires the confection of a new lease with new terms, rather than renewal of the same lease for an additional three year period. C.G. Greer testified that renewal of the lease for another three year period would depend upon whether he and Walters could reach an agreement on the new lease. C.G. Greer's testimony indicated his understanding that he and Walters would have to reach a new agreement and negotiate new terms in order to exercise this renewal provision. The record indicates that no efforts were made by the parties to negotiate a new lease.
We find no error in the trial court's denial of this claim.

Reimbursement of the Water Well Expenses
The Greers finally contend that the trial court erred in denying their claim for reimbursement of expenses associated with *1100 installing a water well on the Alto property. The Greers assert that Walters has been unjustly enriched by the existence of the well and that they have been impoverished by having drilled the well at no cost to Walters and by not having use of the well as intended. We agree with the trial court's denial of this claim.
Jurisprudence interpreting La. C.C. art. 2694 provides that a lessee is entitled to make repairs and improvements that are necessary for use of the property for its intended purpose and that the lessee is entitled to compensation for such works. Pylate v. Inabnet, 458 So.2d 1378 (La.App. 2nd Cir. 1984). Although it is apparent that the Greers placed a well on the Alto property so that the property could be used for its intended agricultural purposes, the well was not a necessary improvement. Walters testified that the Alto property had been irrigated by the Boeuf River since 1927. The testimony of Charles Greer indicated that they first attempted to use a diesel-powered pump to irrigate from the Boeuf River. After the diesel-powered pump broke, he and Jimmy Greer priced new pumps and determined that it would be less expensive to drill a well on the Alto property and use an electric pump submerged in the well. This indicates that the well was not a necessary improvement, but rather was simply a less expensive alternative for irrigating the Alto property.
Jimmy Greer and Charles Greer spoke with Walters before drilling the water well, and Walters consented to the placement of the well on the Alto property. The Greers spent approximately $4,800 on the cost of drilling the well, purchase of the pump, and placement of the pump into the well. They also spent another $300 on electrical expenses to operate the pump. The cost of obtaining a new diesel-powered pump would have been $11,000 plus additional expenses for a trailer. The Greers used the water well during 1994 and 1995. When they removed their equipment from the Alto property, they also removed the pump for use elsewhere, leaving only a hole in the ground and the casing. If Walters were to use the well, he would have to purchase another pump and pay another $300 for electrical power.
Since the Greers have removed the pump from the well and now use it elsewhere, they are not due reimbursement for this expense. They own the pump. Reimbursement is also not owed for the electrical expenses which were necessary to operate the pump, just as the expense of diesel would have been necessary to operate a pump at the Boeuf River. The only remaining issue is whether any reimbursement is owed for the well which remains on the Alto property.
La. C.C. art. 2726 governs ownership and reimbursement of nonessential improvements made by the lessee on the leased property. Article 2726 states, "The right of the lessee to remove improvements and additions he has made to the thing is governed by Articles 493, 493.1, 493.2, and 495." Pylate v. Inabnet, supra. Relevant to the present situation are La. C.C. art. 493 and La. C.C. art. 495. La. C.C. art. 493 provides in part:
Buildings, other constructions permanently attached to the ground, and plantings made on the land of another with his consent belong to him who made them. They belong to the owner of the ground when they are made without his consent.
When the owner of buildings, other constructions permanently attached to the ground, or plantings no longer has the right to keep them on the land of another, he may remove them subject to his obligation to restore the property to its former condition. If he does not remove them within 90 days after written demand, the owner of the land acquires ownership of the improvements and owes nothing to their former owner.
La. C.C. art. 495 provides:
One who incorporates in, or attaches to, the immovable of another, with his consent, things that become component parts of the immovable under Articles 465 and 466, may, in the absence of other provisions of law or juridical acts, remove them subject to his obligation of restoring the property to its former condition.
If he does not remove them after demand, the owner of the immovable may have them removed at the expense of the person who made them or elect to keep *1101 them and pay, at his option, the current value of the materials and of the workmanship or the enhanced value of the immovable.
Both of these articles allow lessees to remove improvements subject to the obligation to restore the property to its former condition.
Regardless of whether the well and casing fit precisely within either of these articles, the Greers have not shown that they either attempted to or intended to remove the casing. The Greers removed the pump and abandoned the leased property, leaving the well and casing behind. To the extent that the casing has value apart from the well, the Greers have not shown the current value of the casing or of the workmanship involved in installing the casing. Furthermore, the Greers have not shown any enhanced value to the Alto property from the well. Because the Boeuf River has been used to irrigate the Alto property since 1927, the well has not necessarily added anything of value to the property. Nothing indicates that either Walters or new lessees have used or will use the well. There is also no showing that Walters elected to retain the well as an improvement to the Alto property. The use of his property with the improvement left behind on it does not constitute an election by Walters to retain the well and does not require reimbursement. See Pylate v. Inabnet, supra.
Because the Greers removed the pump and because they failed to show either the current value of the casing and workmanship or any enhanced value to the Alto property, no reimbursement is due for expenses associated with the well. This claim is denied.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed at the Greers' cost.
AFFIRMED.