Judgment rendered May 5, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,919-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

TAMEKIA CAPERS                                   Plaintiff-Appellee

versus

NORTHPRO PROPERTIES                              Defendant-Appellant
MANAGEMENT, LLC

* * * * *

Appealed from the
West Monroe City Court for the
Parish of Ouachita, Louisiana
Trial Court No. 53363

Honorable A. James Norris, Judge

* * * * *

HALLACK LAW FIRM, APLC                           Counsel for Appellant
By: Dennis W. Hallack
    William H. Hallack, Jr.

TAMEKIA CAPERS                                   In Proper Person

* * * * *

Before GARRETT, COX, and BLEICH (*Pro Tempore*), JJ.

COX, J., concurs in the results with written reasons.

**BLEICH, J. (*Pro Tempore*).**

The defendant, NorthPro Properties Management, LLC, appeals the trial court's findings that the plaintiff, Tamekia Capers, did not abandon the premises and that she was entitled to damages in the amount of $15,000. For the following reasons, we affirm.

## FACTS

On June 16, 2020, the defendant, NorthPro Properties Management, LLC ("NorthPro"), filed a petition to evict the plaintiff, Tamekia Capers, from a house she leased and occupied with her six children. A hearing was scheduled for July 8, 2020. However, on June 23, 2020–two weeks before the date of the hearing–Gabe Livingston, the managing member of NorthPro, hired several men to remove all of Capers's possessions from the house.[1] Capers's belongings, including clothing, furniture, food, dishes, pots and pans, along with spoiled food and dog feces, were placed in a garbage dumpster and hauled to the home of one of the defendant's employees. The items remained in the dumpster for approximately two weeks.

That same day, June 23, 2020, Capers filed a civil lawsuit against NorthPro in West Monroe City Court. Capers alleged that all of her personal property, valued at nearly $44,000, was removed from her home and placed in a garbage dumpster and/or stolen by the men who had been hired to move the items. Capers averred that the following items were removed from her home, and their costs were as follows:

Bedroom set                          $4,599.99
        Long dresser w/mirror
        Queen size bed w/mattresses & headboard

---

[1] The trial court denied the eviction. However, according to Capers, she was unable to return to the house because NorthPro had already leased it to another tenant. Livingston admitted that he had leased the house to another tenant.

|                                   |                      |
|-----------------------------------|----------------------|
| Chest                             |                      |
| Nightstands                       |                      |
| Ottoman                           |                      |
| Living Room set                   | $2,799.99            |
| Leather sectional                 |                      |
| End tables                        |                      |
| Lamps                             |                      |
| Glass table                       |                      |
| 4 Element TVs                     | $100 each (32")      |
| TV stands (4)                     | $50 each             |
| 2 Twin size beds w/ mattresses    | $500 each            |
| 2 Night stands & lamps            | $100 each            |
| 1 Dresser                         | $80                  |
| 2 Full size beds w/mattresses     | $700 each            |
| 1 Long dresser                    | $120                 |
| 1 Night stand w/ lamp             | $100                 |
| Washer & Dryer set                | $1,500               |
| Refrigerator                      | $500                 |
| Deep freezer                      | $200                 |
| Clothing & shoes                  |                      |
| (For 6 girls)                     | $20,000              |
| Food                              | $2,000               |
| Microwave                         | $50                  |
| Dishes                            | $1,500               |
| Clothing & shoes                  |                      |
| (Plaintiff)                       | $4,000               |
| Dining Room set                   | $2,500               |
| Table                             |                      |
| Chairs                            |                      |
| Centerpiece                       |                      |
| Curtains for each room            | $25 each             |
| Mini Refrigerator                 | $75                  |
| Bed sets (4)                      | $50 each             |
| Twin size bed sets (2)            | $35 each             |
| Toys & bicycles                   | $300                 |
| Barbecue pit                      | $40                  |
| Charcoal                          | $20                  |
| Lighter fluid                     | $5                   |
| Porch chairs (4)                  | $20 each             |
|                                   |                      |
| TOTAL:                            | $43,964.98           |

Capers sought the return of her items or damages in the amount of $15,000, the jurisdictional limit for West Monroe City Court.

During the trial, Capers testified that on June 23, 2020, she was at work when a neighbor called and informed her that some men were at her home removing her personal property from the premises. She stated that all

of her belongings, including furniture, televisions, clothing, food, and appliances, were "completely moved out into a dumpster." Capers also stated that the men removed everything she and her children owned, except her refrigerator. She further stated that she believed that some of her items were thrown into the dumpster, and some were kept by the men who had been hired to move them. She also testified that she lived in the house with her six daughters, ages 18, 16, 15, 12, 10, and 7, and the men removed all of their clothing and toys.

Capers testified that she did not abandon the premises. She also stated that she did not have any receipts for any of the items that were removed from the house because "everything I had was in the house." Capers further stated that NorthPro removed all of her papers, receipts, and private documents, including her children's birth certificates, from the house.

Capers testified unequivocally that she did not abandon the house and her property. She testified as follows:

> I was staying at my house. I was still paying [utility] bills at my house. [T]hat was my house. That's where everything I had was at, why wouldn't I stay there? Only time I left there was maybe two nights and that was because [Livingston] had removed my coolant out of my cooling fan out of my air conditioner system. And that was the only two nights that we did not stay there.

During cross-examination, Capers testified that Livingston offered to return her belongings after the eviction was denied, but she declined the items because they had been removed from a garbage dumpster. Capers also testified that she refused to go into the dumpster to retrieve her items. She stated, "I don't want nothing out of a dumpster" because maggots, spoiled

3

food, and other unsavory items could have been inside the dumpster.[2] When questioned again about whether or not she abandoned the premises, Capers replied:

> How would I abandon my house and all of my things are there?
> I have six daughters. Do you honestly believe I would sit up
> and abandon all of this stuff just to start over again?

Capers further testified that her items were removed from the dumpster, and returned to the house, and she was never offered a key to the house so she could retrieve her belongings. When questioned about receipts to prove her loss, Capers replied, "[M]y paperwork was in my house. Everything I had was in my house[.] All my receipts." She admitted that she did consider attempting to obtain receipts from the stores where she had purchased her belongings. Capers presented photographs, which depicted her property piled into the garbage dumpster.

Gabe Livingston, the owner of the property, also testified. He admitted that he moved Capers's belongings out of the house on June 23, 2020, because he "saw [the house] as abandoned." Livingston testified that he went to the house two weeks before he moved Capers's possessions, and he believed that "there was nobody living there." According to Livingston, "the doors were open," and the house had "multiple windows broken." He stated that he called Capers, and she informed him that she "was moving out that Friday." Livingston also asserted that the utilities were still on, and when he went to the house on one occasion, Capers's children were home. He further testified that he went to the house at least three times prior to the incident, but he had never done any repairs on the air conditioner. He also

_____

[2] The trial judge commented, "For whatever it's worth, I don't blame her for not going in a dumpster and jumping through and getting it. I wouldn't do it either."

stated that he had not received any maintenance requests from Capers in at least six months prior to the incident. Additionally, Livingston stated that Capers moved into the house in 2018, and she generally made partial payments on her rent and had never been current on the payments.[3]

According to Livingston, his employees removed all of Capers's belongings out of the house except for her refrigerator. He stated that he did not see a deep freezer or a washer and dryer. He further stated that he observed dog feces "all over" the house, "rotten food" in the kitchen, and mattresses on the floor. Livingston testified that the electricity was on, but the refrigerator had been unplugged. He also stated that the food inside the refrigerator was spoiled, and the house looked as if it had been abandoned "for a while."[4] Livingston also attested that he believed "squatters" had been entering the house, doing drugs, and using the bathroom. He stated that he decided to remove Capers's belongings prior to the eviction hearing because he had "seen evidence of squatters," and he "wanted to take control of the property before somebody burned it down or did some other damage to it."

Livingston declared that Capers arrived at the house while he was removing her belongings, and he offered to transport her belongings to any address she provided. He testified that Capers yelled at him and said, "Thank you . . . you're going to pay for all my stuff." Livingston also stated that he owned the dumpster in which he threw Capers's belongings, and the

---

[3] Capers denied the allegation that she was not current on her rent. She testified that her rent receipts were among the items that Livingston and his employees removed from her home.

[4] This particular testimony is contrary to his testimony that Capers's children were home when he had gone to the house days prior to his decision to remove her belongings from the house.

dumpster was "clean." Further, he stated that after he put Capers's belongings in the dumpster, he moved the dumpster "to a secure location, placed a tarp over it, and stored it." Livingston maintained that he "would be fine with" removing items from a dumpster and reusing them. He stated that the dumpster was not "wet and nasty like most garbage dumpsters are." He also stated that he generally used the dumpster "to clean out houses and transfer the stuff to the dump."

With regard to Capers's items, Livingston insisted that he and his employees put "the big stuff" directly into the dumpster and placed the small items "in garbage bags." He stated that he bagged the rotten food and dog feces "separately from" Capers's other belongings. He also stated that most of the furniture he saw was broken, and there were no bedroom sets in the house. He further stated that he saw one mattress, one box spring, "a few chest of drawers," a table, and a sofa. Livingston testified that he rented the house to someone else, but he had to refund the money to his new tenant because he was forced to move Capers's "stuff back into the house." He stated that he placed a tarp on the newly repaired floors to prevent Capers's items from "damaging the house." He also stated that he did not see any televisions or television stands that belonged to Capers, and there were no beds in the house. Livingston testified that there was only one full-size mattress and one box spring. Further, he stated that the only dishes in the house were the ones "piled up in the sink along with the rotten food." He also stated that he saw some pots and pans; however, he did not "do an inventory so [he did not] know exactly" what items were removed from the house. Livingston stated that he "thinks" there was a dining room table. He also testified that he saw "assorted kids toys," but he did not "think" there

were any bicycles in the house. According to Livingston, the toys filled "a garbage bag or two." He also asserted that he recalled seeing a folding chair on the porch.

Additionally, Livingston testified that "there were lots of bags of clothes" that were already in bags when he arrived at the house. However, he stated that he did not believe the "eight to ten" bags of clothing was valued at $20,000. He also stated that he removed all of Capers's belongings from the dumpster and placed them back inside the house. Livingston insisted that the items he returned to the house were "in the same condition" they were in when they were removed. He stated that the items were placed in the garbage dumpster on June 23, 2020, and they were placed back in the house after the eviction hearing (July 8, 2020). Livingston further testified that his wife attempted to call Capers to inform her that the items had been placed back inside the house. He stated that his wife was unable to reach Capers, so she called Capers's mother and informed her that "we put her stuff back, and we have a key for her." He stated that he never heard from Capers. Livingston also stated that neither he nor his employees kept any of Capers's belongings.

During cross-examination, Livingston testified that he went to the house prior to the hearing on the eviction to see if Capers had moved out of the house. He admitted that he entered Capers's house "three different times" in the two weeks prior to June 23, 2020. He stated that he did not document the dates he entered the house because "I didn't think it mattered." Livingston also admitted that he or his wife testified at the eviction hearing that he removed only "debris" from the house. He stated that he did so

7

because "In my opinion, none of those items were serviceable or had any worth at all."

Marci Livingston, Gabe Livingston's wife, testified. She stated that she called Capers's mother and informed her that "we have [Capers's] things back in the house and if she would just give us a call, we could get a key back to her." According to Mrs. Livingston, Capers's mother responded, "Okay, I'll let her know." Mrs. Livingston stated that she never heard from Capers. She also testified that she was not present when Capers's belongings were removed from, or returned to, the house.

Charles Myers, who was employed by NorthPro, also testified at the trial. He stated that he and "them boys" went to Capers's house and removed "furniture, clothes, whatever was in the house and put it in the [dumpster]." He also stated that the dumpster was empty and dry when they placed Capers's belongings in it. Myers further stated that some of Capers's belongings were "already in bags" when they arrived, and they "put some more in the bags." He testified that he had gone to the house "a couple days" before June 23, 2020, to measure a broken window. He denied Capers's allegation that he and the other workers kept some of her items for themselves.

Myers stated that everything in the residence was placed in the garbage dumpster, and he then hauled the dumpster to his house and covered it with a tarp. Thereafter, he hauled the dumpster back to the house and put Capers's items back inside. Myers testified that in the meantime, the house had been painted and the windows were repaired. He stated that most of Capers's items were returned to the front room of the house "and probably another room [because the] front room wouldn't hold all of it." He also

8

stated that the items were placed on top of a tarp because the floors had been painted. He maintained that he was "not sure" whether or not any televisions were removed from the house; he recalled removing "all the bags, furniture, couch, just a bunch of stuff was in there." Myers also testified that he did not recall seeing a washer, dryer, or deep freezer. He further stated that there was "a little bit of food" or "bad" food in the refrigerator, and a "little bit of stuff" in the kitchen cabinets. According to Myers, Capers's belongings were not in good condition when they were removed from the house, and they were returned in the same condition.

On cross-examination, Myers testified that as the maintenance man, he had been inside Capers's house on many occasions. He stated that he does not recall speaking to Capers on the telephone the day he removed her belongings from the house. Myers also stated that he removed the items because he "was just doing what [he] was told." He further stated that he did not remain on the scene when Capers called the West Monroe City Marshal's office because he "had other things to do." Additionally, he stated that he was not at the house "the whole time" Capers's items were being placed in the dumpster. Myers testified that he was unable to verify whether the other workers removed and kept some of Capers's items. According to Myers, he left the house before the marshals arrived because he needed to repair a water leak at another location.

Henry Francis testified that he was "in the business of cleaning out rental properties after the tenants move out," and he was hired by NorthPro to remove Capers's belongings from the home. Francis also testified that he arranged for "the guys" to assist him, and he left after he showed the men what to do. He also stated that tenants often "leave stuff behind," and he and

9

his crew would discard "the stuff and then, we go in and clean up whatever stuff was left behind[.]" According to Francis, it was "not unusual" to see a lot of items left behind after a tenant moves out of a residence.

Francis further testified that the premises "looked like it was abandoned." He stated that he saw furniture, bags of clothing, some small appliances, and a washer and dryer set. Francis declared that he was not present "while the actual detail work was being done." He also stated that although he did not take an inventory of Capers's items, he specifically remembered "seeing the washer and the dryer in there" because he had to look through the premises to "give [Livingston] a charge of what it would cost." Francis testified that he returned to the house after the job was completed, and by then, "all the stuff was in the dumpster." He stated that he and his employees never kept items for themselves when they were hired to move items out of residences. Francis further stated that he was "hardly ever fully present the whole time" his employees were actively removing items.

During cross-examination, Francis testified that he was unaware that it was illegal to remove a person's belongings from a house without a deputy city marshal being present. He stated, "You know, if I had known it was not lawful, I wouldn't have done it." Francis also testified that he was unaware that the court date for the eviction proceedings had been set. He stated, "All I knew is that I was hired to do a job, and I did what I was hired to do." According to Francis, he was "hired to clean out the house because it was considered ready for another renter to come in, and it needed to be cleaned out and renovated[.]"

10

William Bowick testified that he, JerMichael Grant, and "one other boy" were hired by Francis to remove Capers's belongings from the residence. Bowick attested that the house was "destroyed," a front window was broken, and the living room floor was "covered in dog manure and urine." He also stated that piles of clothes were "scattered everywhere," and dresser drawers were on the floor. Bowick further testified that "clothes [were] piled on the floor, a foot deep in places," and mattresses were "scattered on the floor." He also stated that the back bedroom of the house had "garbage bags full of mildewed clothes." According to Bowick, he and the other men went to the house to "remove everything in the house and put it in the dumpster." He also testified that he saw a refrigerator, but he did not recall seeing a deep freezer, washing machine, or a dryer. Bowick denied keeping any of the items that were removed from the house. He stated that the front window was broken, and "anyone could have gone in and out of there before we got there." He further stated that everything in the house was removed and placed in the dumpster. Bowick testified that it took him and the other men all day "and a little bit [of] the next morning" to remove all of Capers's belongings from the house.

Additionally, Bowick stated that he had no way of knowing whether anyone took any of the items from the dumpster. Bowick also stated that he assisted in taking Capers's possessions out of the dumpster and putting them back inside the house. He testified that "it would have been difficult to know" whether any of Capers's belongings were missing because he was "not really paying attention." He was "just bagging it up and throwing it in there." According to Bowick, the dumpster was "full to the top when we got

it back." He stated that he has no way of knowing whether the items were in worse condition when they returned them.

During cross-examination, Bowick testified that he was not aware that his actions constituted an illegal eviction. He stated that he worked "for a homeowner who told me to go clean out the house," and he was unaware that he needed the presence of a city marshal to legally do so. When the trial judge asked about the washer and dryer, Bowick first stated that "there was no washer and dryer." Thereafter, he stated, "I saw no washer and dryer." The trial judge then informed Bowick that Francis had testified that he saw a washer and dryer in the residence, to which Bowick responded, "Well, I can only tell you what I saw. I can't tell you what he saw." The following colloquy then took place:

> The Court: Alright. So, the rotten food was put in with the pots and pans? Is that what you are telling me?
>
> Bowick: It was all bagged up. Your Honor, like I said, there was–I'm not the only [one] that was working there.
>
> The Court: I understand. And so, when you –
>
> Bowick: – I was busy at the same time.
>
> The Court: Look, I just asked you a simple question. The rotten food was put with the pots and pans?
>
> Bowick: And the dirty dishes.
>
> The Court: Wait. Wait. Wait and the dirty dishes. Then it went into a dumpster and it was in the dumpster for a period of days. Probably almost two weeks and then you emptied it back out and put it back in the house. Is that what you're telling me?
>
> Bowick: Yes sir.
>
> The Court: And you're telling me it was in the same condition as it was when you initially took it out?
>
> Bowick: I didn't open any of the bags. . . . As far as I know, it was like it was when we put [it] in in there.

After hearing the testimony, the trial court found in favor of Capers, and awarded damages in the amount of $15,000, the jurisdictional limit of the West Monroe City Court.[5] The trial court stated:

> [During the eviction proceedings, Livingston] led me to believe that this lady had abandoned the premises. It may not have been in great shape. I don't really know but they initially represented to this Court that they just moved some debris. And that was an outright lie. That was a misrepresentation to this Court. When I saw the picture of all these belongings in a dumpster piled so high that you could see the belongings – this was a huge dumpster. I knew that was untrue . . . it took a day and a half [to remove the items from the house].
> ***
> This abandoned premises had everything in it that lady basically owned. And it may not have been worth a lot or meant a lot to anybody else, but it certainly meant the world to her.
> ***
> So, I'm thinking like–if she abandoned the premises–she abandoned [it] with her kids there. All the–so much clothes, pots, pans, –I didn't buy it in the eviction, and I don't buy it now. Self-help is not allowed under the law. [Livingston] may have had an absolute basis for the eviction, but he's got to go to Court and he's got to let the Court so find.
> ***
> I found that [Livingston] didn't have any credibility at the eviction and his credibility hasn't been rehabilitated today. They tell me there's no washer and dryer, yet I have one of the– the man in charge of moving it out saying there was a washer and dryer. Did you bag up any clothes? No. Well, yeah yeah yeah, we did. And everything was in just as good a condition, but we put the rotten food in with the pots and pans and then we put it in the dumpster and three weeks later we brought it back. Self help is not allowed under the law. It's just not allowed. When the Governor and President of the United States issue orders saying that there are no evictions that means there are no evictions and when you filed your eviction the day after that

---

[5] La. C. C. P. art. 4843(C) provides:

In the City Court of Bossier City, and any city court in which the population of the territorial jurisdiction is less than fifty thousand, except as otherwise specifically provided by law, the civil jurisdiction is concurrent with the district court in cases where the amount in dispute, or the value of the property involved, does not exceed fifteen thousand dollars.

moratorium was lifted and you have a hearing, you have to wait until that hearing. And you didn't. You took everything this lady basically had in the house which, according to her testimony, was her life. She doesn't have any documentation of anything because he took everything. He can't benefit from the fact that she can't document her lost possessions when he took everything that would evidence those possessions.

\*\*\*

The defendant appeals.

## DISCUSSION

NorthPro contends the trial court erred in finding that Capers did not abandon the premises. According to NorthPro, Livingston's belief that the house was abandoned was reasonable because Capers had told Livingston and others that she was moving out of the house. NorthPro also maintains that when Livingston arrived at the house, he noticed that the door was "wide open," some of the windows were broken, and there was evidence that "squatters" were using drugs in the house.

Generally, a lessor may evict a lessee and deliver a notice to vacate the premises. However, it is well-established that a lessor has no right to take possession or in any way disturb the possession of the lessee without first resorting to judicial process. *Platinum City, L.L.C. v. Boudreaux*, 11-559 (La. App. 3 Cir. 11/23/11), 81 So. 3d 780; *Weber v. McMillan*, 285 So. 2d 349, 351 (La. App. 4 Cir. 1973). If the lessee or occupant does not comply with the *judgment of eviction* within twenty-four hours after its rendition, the *court shall issue immediately a warrant directed to and commanding its sheriff, constable, or marshal to deliver possession of the premises to the lessor or owner*. La. C. C. P. art. 4733 (emphasis added).

In the instant case, the following facts are undisputed: NorthPro filed an eviction petition on June 16, 2020; a hearing was scheduled for July 8,

14

2020; NorthPro did not wait for the court to enter a judgment of eviction and issue a warrant commanding the sheriff, constable, or marshal to deliver possession of the premises to NorthPro; rather, on June 23, 2020, NorthPro circumvented the entire judicial process and took possession of the leased premises by removing all of Capers's personal property.

NorthPro maintains that it was justified in removing Capers's belongings because she abandoned the premises and her possessions. According to NorthPro, the evidence of abandonment included broken windows, a door that was left "wide open," an unplugged refrigerator, bags of clothing lying around, decaying food in the kitchen, and canine feces inside the house.

While a lessor must ordinarily utilize the appropriate procedure and judicial process to take possession of leased property prior to termination of the lease, a jurisprudential exception permits self-help by the lessor when the lessee unjustifiably abandons the premises. *Walters v. Greer*, 31,480 (La. App. 2 Cir. 1/22/99), 726 So. 2d 1094; *Sunbelt Sec. Services, Inc. v. Delahoussaye,* 572 So. 2d 598 (La. App. 4 Cir. 1990). La. C.C.P. art. 4731(B) provides:

> After the required notice [to vacate] has been given, the lessor or owner, or agent thereof, may lawfully take possession of the premises without further judicial process, upon a reasonable belief that the lessee or occupant has abandoned the premises. ***Indicia of abandonment include a cessation of business activity or residential occupancy, returning keys to the premises, and removal of equipment, furnishings, or other movables from the premises.*** (Emphasis added).

Abandonment requires voluntary relinquishment of the premises by the lessee with the intent to terminate without vesting ownership in another. *Walters*, *supra*; *Bill Kassel Farms, Inc. v. Paul*, 96-462 (La. App. 3 Cir.

15

12/11/96), 690 So. 2d 807, *writ denied*, 97-0712 (La. 4/25/97), 692 So. 2d 1095. The abandonment of property by a tenant to such an extent as to vest title and control in the landlord involves both an act of abandonment and a specific intent to abandon. *Mansur v. Cox*, 04-0140 (La. App. 1 Cir. 12/30/04), 898 So. 2d 446, citing *Powell v. Cox*, 92 So.2d 739 (La. App. 2 Cir. 1957). The determination of abandonment is a factual determination and cannot be disturbed absent a finding that the trial court was clearly wrong. *Walters*, *supra*; *Preen v. LeRuth*, 430 So. 2d 825 (La. App. 5 Cir. 1983).

Here, NorthPro did not present evidence of any of the factors set forth in La. C. C. P. art. 4731. Specifically, there was no evidence that Capers intended to cease to occupy the residence and/or that she surrendered her keys to the house. Capers testified she and her children stayed in the house at night, but due to the broken air conditioner, it was too hot to remain there during the daytime.[6] She stated that her possessions were removed while she was at work and her children were at her sister's house. Livingston admitted that the utilities (lights and water) remained active in the house. He also testified that on at least one occasion in the days leading up to the incident, Capers's children were in the house when he went to the residence. Further, NorthPro's witnesses testified that Capers had so many belongings in the house that it took them all day, and a portion of the next day, to remove them.

Nevertheless, NorthPro maintains that the state of the house, with broken windows, an open door, scattered belongings and clothing, and the

_____

[6] Capers testified that Livingston intentionally disabled the air conditioner. Livingston denied that allegation.

16

presence of canine feces, was a clear indication that Capers had abandoned the home. However, the evidence established that there was no obvious removal of Capers's personal property by Capers or anyone directed by her to do so. Notwithstanding Livingston's testimony, the other defense witnesses testified that they removed clothing, furniture (including beds and mattresses), appliances, food, pots, pans, dishes, and plates from the home. Capers testified that she and her children were present in the home the night before her property was removed, and they were only away from the home because it was too hot to remain in the house during the daytime.

Based on our examination of this record, we find that the trial court was not clearly wrong in concluding that Capers did not abandon the premises. Despite NorthPro's assertions, this record contains ample evidence that the house was occupied when Livingston and his employees arrived at the premises. Further, Livingston could have easily ascertained the occupancy of the home by contacting Capers before, rather than after, having her possessions removed from the premises. We acknowledge Francis' testimony that some tenants abandon residences leaving "a lot of stuff" inside. However, based on this record, we find that it was not reasonable for Livingston to conclude that Capers left her furnishings, possessions, and private essential documents, while continuing to pay utilities on an "abandoned" house. The trial court found Capers to be a credible witness and clearly expressed its belief that the testimony provided by Livingston, his wife, and other defense witnesses was not credible. This assignment lacks merit.

NorthPro also contends the trial court erred in awarding monetary damages to Capers. According to NorthPro, Capers's belongings were

17

returned in the same condition and at the same location from which they had been removed, and Capers refused to accept and/or retrieve her items. Additionally, NorthPro argues that the trial court committed legal error in measuring Capers's damages by the replacement cost of her property, rather than the fair market value of the items.

The Louisiana Civil Code itself does not identify causes of action for "conversion." However, causes of action for conversion have been inferred from the codal articles providing that the rights of ownership, possession, and enjoyment of movables are protected by actions for the recovery of the movables themselves, actions for restitution of their value, and actions for damages. *Dual Drilling Co. v. Mills Equip. Investments, Inc.*, 98-0343 (La. 12/1/98), 721 So. 2d 853. In Louisiana, conversion is an intentional tort and consists of an act in derogation of the plaintiff's possessory rights. *Dhaliwal v. Dhaliwal*, 49,973 (La. App. 2 Cir. 11/25/15), 184 So. 3d 773, *writ denied*, 16-0236 (La. 4/4/16), 190 So. 3d 1204; *Aymond v. Citizens Progressive Bank*, 52,623 (La. App. 2 Cir. 6/26/19), 277 So. 3d 477, *writ denied*, 19-1200 (La. 10/15/19), 280 So. 3d 602. To constitute a conversion, an intentional dispossession and/or exercise of dominion or control over the property of another in denial of, or inconsistent with, the owner's rights must be established. *Aymond*, *supra*; *Dhaliwal*, *supra*.

In the instant case, NorthPro maintains that it is not liable to Capers for any damages because her property was returned to the house in the same condition it was in when it was removed. NorthPro argues that it cannot be held responsible for Capers's decision not to retrieve her items.

In rendering its decision, the trial court noted the testimony of Livingston's employees with regard to the removal and return of Capers's

18

belongings. The witnesses testified that all of Capers's items were placed in the dumpster, along with food, some of which they described as "rotten," and canine feces. The items were then covered with a tarp and stored in the garbage dumpster, in the summer heat, for approximately two weeks. The trial court found that the testimony–that the items were returned in the same condition–was not credible. We find no error in the trial court's determination. Under the facts of this case, we find that Capers should not have been forced to resort to digging through dog feces and spoiled food to retrieve belongings that Livingston and his employees wrongfully removed from her home. NorthPro is not relieved of its liability for damages due to Capers's decision to decline to retrieve the items. This argument lacks merit.

NorthPro further contends the trial court erred in awarding damages to Capers because she failed to present any evidence that she was entitled to damages. According to NorthPro, Capers testified as to the amounts she paid for her items; however, she did not prove the fair market value of the property at the time it was allegedly converted. NorthPro further asserts that Capers could have gone to the stores, from which all of her belongings were purchased, and obtained evidence of the cost, or she could have ascertained the value of items that were used, but similar to those she owned.

In the assessment of damages in cases of offenses, quasi offenses and quasi contracts, much discretion must be left to the judge or jury. La. C.C. art. 2324.1; *Fenner v. Schley*, 51,842 (La. App. 2 Cir. 3/14/18), 246 So. 3d 770; *Martinez Mgmt., Inc. v. Caston*, 39,500 (La. App. 2 Cir. 4/13/05), 900 So. 2d 301. The measure of damages for wrongful conversion is the return of the property, or if it cannot be returned, the value of the property at the

19

time of conversion. *Dual Drilling Co.*, *supra*; *Fenner*, *supra*. General damages may also be awarded when appropriate. *Quealy v. Paine, Webber, Jackson & Curtis, Inc.*, 475 So. 2d 756 (La. 1985); *Fenner*, *supra*; *Noel v. Landry*, 531 So. 2d 570 (La. App. 2 Cir. 1988), *writ denied*, 535 So. 2d 746 (La. 1989). General damages, by their very nature, are subjective and incapable of exact computation. *McDill v. Utica Mut. Ins. Co.,* 475 So. 2d 1085 (La. 1985); *Delores M. v. S. Farm Bureau Cas. Ins. Co.*, 44,883 (La. App. 2 Cir. 1/6/10), 29 So. 3d 654.

In the instant case, Capers testified that her receipts and documents that would have proved the value of her belongings were among the items Livingston and his employees removed from her home. She provided the trial court with a detailed descriptive list of her items and photographs of her belongings after they were piled into the dumpster. Capers further testified with regard to the amount she had recently paid for her groceries and the amounts and types of clothing and other personal items she had purchased for herself and her six daughters. The trial court did not find credible the defense's insistence that Capers's items were practically worthless. Based on our review of this record and the unique facts of this case, we find that the trial court did not abuse its discretion in awarding Capers damages in the amount of $15,000.[7]

Further, NorthPro contends the trial judge violated Canon 3(A)(4) of the Code of Judicial Conduct by giving Capers, a self-represented litigant, an "unfair advantage" during these proceedings. NorthPro asserts that the trial

---

[7] In the writer's opinion, the defendant was fortunate that this case was presented to a court of a limited jurisdictional amount.

20

court "crossed the line from neutral arbiter into advocate" during Capers's

cross-examination of the defense witnesses, and NorthPro takes issue with

some of the questions the trial court posed to some of the witnesses.[8]

---

[8] NorthPro cites the following colloquy that occurred during Capers's cross-examination of Livingston as an example of the court's alleged bias:

> Court: Okay. What else do you want to ask him?
> Ms. Capers: I just want to know why was he in my house prior to July the 8th?
> Court: He's taken the position that you said you were moving out so he went to check and see if you were moving out. You moved out. So, he felt free to go do whatever he wanted to do.
> Ms. Capers: Okay. On July 8th when we came to Court, you said that all you removed from my house was debris. Is that true?
> Mr. Livingston: I didn't say that.
> The Court: Well, your wife said it.
> Ms. Capers: Thank you. Prior to-
> The Court: That's a good question.
> Mr. Livingston: Okay.
> The Court: And I'd like an answer.
> Mr. Livingston: What was the question?
> Ms. Capers: Prior-
> The Court: It's real simple. In Court y'all represented that you just moved some debris. Why did you say that in a Court of law when you moved more than debris?
> Mr. Livingston: In my opinion, none of these items were serviceable or had any worth at all.
> The Court: Alright. Well, then your wife later apologized for misrepresenting that to the Court so, you're now saying that's a true statement?
> Mr. Livingston: Can you ask me—because I don't know what to answer here?
> The Court: I know you don't know what to answer because you're not-you're not straight up.
> Mr. Livingston: Do you want me to answer why she used the word debris?
> The Court: No, why do you agree with it now? You're agreeing with it now. You're saying basically I considered it all debris. That's what you just said. That's what you implied. And I told you-I'm letting you know that your wife later apologized and that she said that she was wrong in saying that. But now, you're maintaining that she was right in saying that and she said she was wrong in saying that. So, I don't know how you answer it because you got yourself in a mess.

Further, when the trial court questioned Bowick regarding the washer and dryer, Bowick first testified that there was not a washer/dryer in the house. He then stated that he did not see a washer/dryer. The court pointed out the difference between the two statements and noted that a prior witness had testified that he saw a washer/dryer.

21

NorthPro also argues that it was denied its due process right to a fair trial, and the trial court conducted the trial "in a manner that created an appearance of partiality to the reasonable person and also gave an unfair advantage to [the] self-represented" plaintiff.

Whether a judge has violated the Code of Judicial Conduct is an issue over which the Louisiana Supreme Court has exclusive jurisdiction. Therefore, we will only address the issue of whether NorthPro was deprived of its right to a fair trial.

The tantamount duty of a trial judge is to conduct fair and impartial proceedings. *In re Cooks*, 96-1447 (La. 5/20/97), 694 So. 2d 892; *Daigle v. City of Shreveport*, 46,429 (La. App. 2 Cir. 10/5/11), 78 So. 3d 753, *writ denied*, 11-2472 (La. 2/3/12), 79 So. 3d 1027. It is well-settled that a trial judge is presumed to be impartial. *State v. Edwards*, 420 So. 2d 663 (La. 1982); *Daigle*, *supra*.

We have reviewed this record in its entirety. The trial judge had the opportunity to preside over both the eviction proceeding and the civil lawsuit between these parties. The court was afforded the opportunity to listen to the testimony and observe the demeanor of the witnesses. It is clear from some of the questions the trial court posed to some of NorthPro's witnesses, and from the court's oral reasons for judgment, that the court found their testimony to be incredible. The witnesses provided conflicting testimony regarding what was removed from the house, *i.e.*, debris, a scant amount of "broken" furniture, beds, dressers, appliances, washer/dryer set. The trial court articulated its frustration, as well as its frank disbelief, as to the testimony of Livingston, his wife, and their employees. In our view, the trial

22

court demonstrated exemplary restraint, and its conduct and comments did not rise, in any way, to the level of bias or impartiality.

Additionally, there is nothing in this record which demonstrates the trial court behaved as an advocate and/or gave Capers an unfair advantage during the proceedings. Rather, the record shows that the court admonished Capers on several occasions and sustained defense counsel's objections when Capers failed to comply with the correct procedures. Based on our review of the record, we find no evidence to rebut the presumption that the trial judge was impartial, or to prove that NorthPro was deprived of its right to a fair trial. This assignment lacks merit.

## CONCLUSION

For the reasons set forth herein, we affirm the trial court's judgment and award of damages. The costs of this appeal are assessed to the defendant, NorthPro Properties Management, LLC.

**AFFIRMED.**

**COX, J.,** concurs in the results with written reasons.

Although I understand the need of the business owner to take care of their property and make sure they are able to make their mortgage payments, pay insurance, and pay their taxes, NorthPro, in this situation, did not follow the laws as set forth by our legislature. Ms. Capers was harmed due to the failure of NorthPro to follow the proper procedures and is therefore entitled to compensation. Lessors and lessees depend on each other. One provides a home, and in return for that home, the lessee provides rent for that home and expects peaceful possession of that home. Regardless of whether NorthPro believed the premises were abandoned, they should have followed the rules and secured the premises until either Ms. Capers could have been contacted or the proper eviction proceeding took place in court. As such, I must concur in the results of this case.